Joseph P. Moodhe
Shannon Rose Selden
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, New York  10022
Tel.:  (212) 909-6000
Fax:  (212) 909-6836
jpmoodhe@debevoise.com
srselden@debevoise.com

*Counsel to Defendants Notz, Stucki Management
(Bermuda) Limited, and Notz, Stucki & Cie, S.A.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------x
                                                    :
                                                    :
                                                    :
MATIAS ERAUSQUIN, et al.,                           :
                              Plaintiffs,           :
            v.                                      :   No. 09 Civ. 7846 (WHP)
                                                    :   **ECF CASE**
NOTZ, STUCKI MANAGEMENT                             :
(BERMUDA) LIMITED, et al.,                          :
                                                    :
                              Defendants.           :
                                                    :
-----------------------------------------------------------------------x

## DECLARATION OF MAURICE HARARI ON SWISS LAW

Maurice Harari, pursuant to 28 U.S.C. § 1746, declares the following:

**I.     Introduction**

1.     I am over the age of 18 and competent to testify. I make this declaration in

support of the motion to dismiss by Notz, Stucki & Cie, S.A., and Notz, Stucki

Management (Bermuda) Limited (collectively "Notz Stucki") based on personal knowledge and a review of legal authorities in Switzerland.

2.     I am a member of the bar of the Canton of Geneva and a partner at the Geneva law firm Lachat, Harari & Associés. I have served successively as a prosecutor, investigating magistrate and as a civil and penal judge in the Geneva court of first instance. I have also taught judicial assistance in criminal matters at the University of Fribourg since 2001, and I lecture regularly at the University of Geneva and at the *Haute école spécialisée de Suisse occidentale* ("HES-SO") (University of Applied Sciences Western Switzerland) of Neuchâtel.  My complete curriculum vitae is attached as Exhibit A to this Declaration.

3.     I have been asked by Notz Stucki's New York counsel, Debevoise & Plimpton LLP, to submit this Declaration in support of Notz Stucki's Motion to Dismiss in the above-captioned case. I have been asked to address the adequacy of the Swiss courts as an alternative forum to the civil action initiated by the *Erausquin* Plaintiffs against Notz Stucki and UBS (Luxumbourg) S.A. ("UBSL").

4.     In connection with this declaration, I have reviewed the Amended Class Action Complaint (hereinafter: "Complaint") in this matter dated November 24, 2010. In this declaration, I will start by describing the Swiss judicial system and show that Swiss courts could have jurisdiction over the Notz Stucki/UBSL Defendants upon consent. I will then briefly address the issues of choice of law. Finally, I will analyze the *Erausquin* Plaintiffs' claims from the perspective of Swiss substantive law.

## II.    Summary of Conclusions

Although my conclusions will be addressed more extensively below, I will provide here a short summary of my opinion:

- The Swiss courts may exercise jurisdiction over the Plaintiffs' action.
- Swiss substantive law may be applicable.
- Under Swiss law, Plaintiffs could bring claims and, if proven, obtain relief, based on the conduct and theories alleged in the Complaint.

I make this declaration based on my own personal knowledge and a review of the relevant statutes, treaties and other legal sources cited herein. I have also reviewed the Complaint, and specifically the claims put forth by the Plaintiffs, with the aim of establishing whether these claims are compatible with possible claims and corresponding damages available under Swiss law.

## III.    Background and Qualifications

5.      I am a senior partner with the Lachat, Harari & Associés law firm, and have been practicing as an attorney in Geneva, Switzerland, since 1990 in the field of international criminal and civil litigation. I was admitted to the bar of Geneva in 1973.

6.      I received my law degree from the University of Lausanne in 1970 and completed an L.L.M. at New York University in 1974. I was a student in the S.J.D. program at Harvard Law School in 1975-76. I returned to Switzerland and practiced in a prominent criminal law firm in Geneva from 1976 to early 1978.

7.     Between 1978 and 1990, I served within the judicial power of the Canton
of Geneva, successively as a Prosecutor, an Investigating Magistrate, and a civil and
penal Judge. In my capacity as a judge, I frequently executed requests for assistance
issued by U.S. judges through procedures very similar to those now in place under the
Hague Convention. I currently serve as an alternate Judge at the Geneva *Cour de
Cassation pénale*, the highest cantonal court in Geneva for criminal matters.

8.     Since 2001, I have been a lecturer at the University of Fribourg
(Switzerland), where I teach a course on judicial assistance in criminal matters. I also
lecture regularly at the University of Geneva and at the HES-SO of Neuchâtel. I have
published extensively on criminal law, criminal procedure and mutual assistance in
criminal matters, most recently in connection with a colloquium held in Lausanne on
September 4, 2009, organized by the *Fondation pour la formation continue des juges
suisses* ("Foundation for the continuing professional education of Swiss judges"). I also
have extensive experience in international private law, both as a judge and as an attorney.

9.     I am a member of the Swiss Bar Association, the Geneva Bar Association,
the Swiss Society of Criminal Law and have been listed in "Who's Who Legal, Business
Crime Defence 2010."

**IV.    Description of the Swiss Judicial System**

10.    Switzerland is based on a federal system of twenty-six Cantons. Each
Canton typically contains two levels of courts: first and second instance.

11.     In Switzerland, a person or company, whether Swiss or foreign, who has a

claim against another person or company, such as Notz Stucki, may seek relief by filing a

civil action against such person or entity in the Swiss cantonal courts.

12.     The Swiss Federal Constitution (hereinafter: "Constitution") guarantees

independence, impartiality and fairness of the federal and cantonal courts.

13.     For example, Article 29 ("General procedural guarantees") states:

> Everyone has the right to equal and fair treatment in judicial and
> administrative proceedings and to have their case decided within a
> reasonable time.
>
> Each party to a case has the right to be heard.
>
> Anyone who does not have sufficient means has the right to free
> legal advice and assistance unless their case appears to have no
> prospect of success. If it is necessary in order to safeguard their
> rights, they also have the right to free legal representation in court.[1]

14.     Article 29a ("Guarantee of access to the courts") states:

> In a legal dispute, everyone has the right to have their case
> determined by a judicial authority. The Confederation and the
> Cantons may by law preclude the determination by the courts of
> certain exceptional categories of case.

15.     Article 30 ("Judicial proceedings") states:

> Anyone whose case falls to be judicially decided has the right to
> have their case heard by a legally constituted, competent,
> independent and impartial court. Ad hoc courts are prohibited.
>
> Unless otherwise provided by the law, anyone against whom civil
> proceedings have been raised has the right to have their case
> decided by a court within the jurisdiction in which they reside.

---

[1] English is not an official language of the Swiss Confederation. This English translation is provided by the
Swiss government on its website (www.admin.ch/ch/e/rs/1/101.en.pdf) for informational purposes only.

> Unless the law provides otherwise, court hearings and the delivery
> of judgments shall be in public.

16.     These constitutional provisions reflect the Swiss tradition separating

governmental and legislative powers from the Judiciary. The Swiss Supreme Court's case

law has developed and strengthened this tradition of independence, which is a

fundamental component of the Swiss Judicial System. In addition, the constitutional

guarantee of the courts' impartiality has resulted in strict rules governing the

disqualification and recusal of judges.

## V.     Swiss Civil Procedure

17.     In January 2007, the amended Article 122 par. 1 of the Swiss Constitution

entered into force, providing that legislation in the field of civil law[2] and civil procedure

shall be federal, rather than organized by the Cantons. Accordingly, the unified Swiss

Code of Civil Procedure (hereinafter: "SCCP") was enacted in 2008 and entered into

force on January 1, 2011. Before the SCCP, each of the twenty-six Cantons had its own

set of civil procedure rules. In addition, the Federal Constitution and several federal

statutes contained procedural rules. Finally, the Swiss Supreme Court had developed

case law on several basic issues. Now, the Cantons remain responsible for the

organization of the courts and the administration of justice in civil matters, but must

apply the federal SCCP procedural rules in civil matters.

18.     The SCCP is a uniform civil procedural law. It is a code with 408

provisions regulating civil procedure and domestic arbitration and it applies to the whole

---

[2] As a matter of fact, the Federal Civil Code was enacted in 1907 and entered into force in 1912.

Swiss territory. The Code follows a typical civil law structure. There is a first part with general provisions applying potentially to all types of cases, and a second part containing more specific provisions which apply to special procedures such as those involving divorce suits, lease or employment contracts, etc. Attached to the present declaration as Exhibit B is the Table of Contents of the SCCP, which provides a good overview of the different questions addressed by this novel procedural law. Should Swiss law apply to the present Claim, all the general rules of the SCCP would be relevant.

## a. Actions Involving More Than One Claimant

19.     Switzerland has decided not to introduce the Anglo-American concept of class action in the SCCP. The view was taken that the filing of a claim by one person, on behalf of a great number of people without their authorization and with mandatory effect for them, is contrary to the legal European tradition.[3] Therefore, SCCP rests on the fundamental principle that only the holder of a right may decide to file the claim stemming from such right.

20.     However, according to Article 71 par. 1 SCCP, claimants may pursue collective actions on the sole condition that their rights or duties stem from similar facts or similar legal circumstances. According to Article 72, multiple parties may also appoint a common counsel to represent their interests. However, Article 71 par. 3 provides that each party retains the power to proceed independently from the others, and the proceedings may cease for certain parties while continuing for others.

---

[3] Federal Council report related to the SCCP, FF 2006 6841, page 6902.

21.     In addition, the SCCP offers a wide range of options for third party interventions. Hence, a party may call a third party for assistance into the proceedings (Articles 78 and ff SCCP), which includes the possibility of having a person become a party to the proceedings by filing a third party notice (Article 81 and ff SCCP). A third party may also choose to intervene spontaneously into the proceedings (Articles 73 and ff SCCP). The goals of these institutions are economy (of time and costs) and efficiency by avoiding contradictory judgments.

### b. Jurisdiction Over the Defendants

22.     According to Article 30 par. 2 of the Constitution and Article 2 of the Federal Act on Private International Law (hereinafter: "PILA"), the Swiss judicial authorities at the defendant's domicile have jurisdiction, unless otherwise provided by the law.

23.     Both Article 112 par. 1 and Article 129 par. 1 PILA, which relate specifically to contract claims and to tort claims, confirm the jurisdiction of the Swiss courts at the defendant's domicile.

24.     For companies, the registered office is equivalent to domicile (Article 21 par. 1 PILA).

25.     According to Article 5 PILA, in matters involving an economic interest, parties may agree on the court that will be issuing relief on any potential or existing dispute arising out of a specific legal relationship. The agreed-upon court may not deny jurisdiction (a) if one of the parties is domiciled or has its habitual residence or a place of

business in the Canton where the chosen court sits or (b) if Swiss law is applicable to the dispute (Article 5 par. 3 PILA).

26. In addition, pursuant to Article 6 PILA, in matters involving an economic interest, a court shall have jurisdiction if the defendant proceeds on the merits without reservation, unless such court denies jurisdiction to the extent permitted by Article 5 par. 3 PILA.

27. As applied to Defendants Notz, Stucki & Cie, S.A., Notz, Stucki Management (Bermuda) Ltd. and UBS (Luxembourg) S.A., the above-mentioned rules would result in two different sets of consequences in terms of jurisdiction.

28. Notz, Stucki & Cie, S.A., is a Swiss company, whose registered office is located at 98, rue de Saint-Jean in Geneva, Switzerland. Therefore, Courts of the canton of Geneva have jurisdiction to deal with any claim filed against Notz Stucki & Cie, S.A., pursuant to Article 30 par. 2 of the Swiss Constitution and Article 2 PILA.

29. Notz, Stucki Management (Bermuda) Ltd. (hereinafter: "Notz Stucki Bermuda") is a Bermudian company, whose registered office is located at 29 Middle Road, Devonshire, Bermuda. Swiss courts therefore have no jurisdiction for ruling on any claim filed against Notz Stucki Bermuda on the basis of Article 30 par. 2 of the Swiss Constitution or Article 2 PILA. However, pursuant to Article 6 PILA, Notz Stucki Bermuda remains free to accept explicitly or implicitly the jurisdiction of the Geneva courts to deal with the claim of the Plaintiffs. In such a case, taking into account that another party, i.e. Notz, Stucki & Cie, S.A., is domiciled in Geneva, the Geneva courts could not deny jurisdiction.

30.     Finally, UBS (Luxembourg) S.A. (hereinafter: "UBSL") is a company organized under the laws of Luxembourg, whose registered office is located at 33A John F Kennedy, Luxembourg-Kirchberg, Luxembourg.  Swiss courts would therefore have no jurisdiction to rule on any claim filed against UBSL on the basis of Article 30 par. 2 of the Swiss Constitution or Article 2 PILA. However, as with Notz Stucki Bermuda, and pursuant to Article 6 PILA, UBSL remains free to accept explicitly or implicitly the jurisdiction of the Geneva courts to deal with the claim of the Plaintiffs. In such a case, taking into account that another party, i.e. Notz, Stucki & Cie, S.A., is domiciled in Geneva, the Geneva courts could not deny jurisdiction.

### c. Gathering of Evidence

31.     Relevant evidence could be gathered and introduced in Switzerland. Civil litigation according to SCCP is divided into two main phases: (1) the exchange of written briefs and the preparation of the main trials and (2) the main trials.

> (i)   During the first phase, parties submit their written briefs, which set forth to the court (1) the relevant facts the parties want the court to admit, (2) the legal theories involved and (3) the relief sought from the court. When it is justified by the circumstances, the judge may order a second exchange of written briefs (Article 225 SCCP).

> (ii)  In support of their briefs, the parties are allowed to introduce all the documentary evidence in their possession whether obtained abroad or in Switzerland.

> (iii) The taking of evidence - which includes *inter alia* disclosure of documents, hearing of the parties and/or witnesses, expertise and inspection (Article 168 SCCP) - occurs, as a general rule, during the second phase.

32. According to Article 160 SCCP, both the parties and the witnesses are bound by a duty to collaborate in the collection of evidence. This includes the duty (1) to attend depositions and tell the truth, (2) to produce particular documents that are requested (except correspondence with lawyers) and (3) to allow examination of their person or inspections of their assets. Parties or witnesses who do not speak the native language of the court -- which is French in Geneva – may testify in their own language through a translator.

33. Swiss courts are empowered to order third-party witnesses domiciled in Switzerland to appear and to produce documents that would be relevant to the litigation. The attendance of witnesses domiciled in Switzerland is secured through the use of court orders, comparable to subpoenas in the U.S. system.

34. In addition, Swiss courts, by issuing rogatory letters through international judicial assistance channels may secure testimony or other evidence from third-party witnesses domiciled outside of Switzerland. Mainly, the Swiss courts will use the Hague Convention on the taking of evidence abroad in civil and commercial matters dated March 18, 1970 (Hague Evidence Convention) to obtain testimony of a witness domiciled in a country that is also a Member to the Convention.

35. In civil litigation, the court takes evidence upon motion of one party. As a precondition to taking evidence, the court must conclude that the proposed evidence relates to an issue of fact that is relevant to the resolution of the case. The taking of evidence is a function undertaken by the judiciary, not by the parties, although the parties may submit in their briefs to the court evidentiary requests and the reason why a

particular piece of evidence would be relevant to the case. It is then up to the judge to decide whether or not the requested evidence should be produced.

36.     Witnesses are interviewed primarily by the judge (Article 172 SCCP). There is no direct and cross examination of witnesses by the parties' counsels, although the parties are allowed to address supplementary questions to the witness, either by asking the judge to present the question to the witness or, if allowed to do so by the judge, by questioning the witness directly (Article 173 SCCP). The witnesses may be brought to be confronted with one another or with the parties (Article 174 SCCP), generally with the aim of elucidating contradictory statements or of testing a witness's credibility. In practical terms, this simply means having two or more witnesses being examined at the same hearing and at the same time.

37.     If a witness refuses to provide testimony without a valid reason, the court may draw an adverse inference or assess sanctions, depending on the circumstances. For instance, a person may have a valid reason to refuse to cooperate if he or she is a direct relative of a party (Article 165 SCCP). The party himself may also refuse to cooperate if, for instance, such cooperation would expose a relative to criminal or civil action (Article 163 SCCP). The lawyer's duty of confidentiality is also protected. Such is not necessarily the case with professional confidentiality in other fields of activity (such as in the banking sector). It is up to the person who refuses to cooperate to convince the judge that the public or private interest to abide by the rule of confidentiality is more important than the revelation of the truth or the exhibition of documents.

38.     Should the court decide that the refusal to cooperate was unjustified, it could resort to a series of sanctions or measures, including fines up to CHF 10'000.-, and even the temporary arrest of the witness[4].

39.     If a judge does not have the necessary knowledge required to understand a complex or technical issue, the court may, on its own initiative or on motion of either party, appoint an expert to render an opinion (Article 183 par. 1 SCCP). The judge, in conjunction with the parties, prepares the questions to be submitted to the expert (Article 185 SCCP).

### d. Hearing and Appeal

40.     Once the gathering of evidence has been completed, the parties usually have the opportunity to comment on the evidentiary proceedings either at a hearing or, should all the parties request it, in the form of a written brief (Article 232 SCCP).

41.     Judgments from the courts of first instance in Geneva are subject to an appeal before the Geneva Court of Justice.

42.     The Geneva Court of Justice ruling is itself subject to an appeal before the Swiss Supreme Court. Such appeal is limited to legal issues and shall not, except under specific circumstances, lead to a re-examination of the factual issues.

## VI.     Application of Foreign Law

43.     The fact that Swiss courts have jurisdiction over a case does not necessarily mean that they will apply Swiss law to the claims raised by the parties.

---

[4] However, the judge may not send the witness to jail for refusing to answer questions (Federal Council Report on the SCCP, June 28, 2006, page 6929).

44.     In order to decide what law should apply in a given case with an
international dimension, Swiss courts will refer to the rules provided by PILA or any
international convention on applicable law.

45.     Contract claims, as a general principle, are governed by the law chosen by
the parties (Article 116 par. 1 PILA). The choice of law must be expressly chosen or
based on the provisions of the contract or the circumstances (Article 116 par. 2 PILA).

46.     Failing an agreement on the law to be applied, contracts are governed by
the law of the state with which they have the closest connection (Article 117 par. 1
PILA). PILA provides additional rules as to what constitutes the "closest connection".

47.     As for tort claims, the parties are permitted to agree on the applicable law
at any time after the damage occurs (Article 132 PILA).

48.     Failing agreement, and when the tortfeasor and the injured party do not
reside in the same state, the claims are governed by the law of the state in which the tort
was committed. However, if the tort's result occurred in another state, the law of that
state applies if the tortfeasor should have foreseen that the result would occur there
(Article 133(2) PILA).

49.     The content of the foreign law shall be established by the authority on its
own motion. For this purpose, the cooperation of the parties may be requested. In matters
involving an economic interest, the task of establishing foreign law may be assigned to
the parties (Article 16 par. 1 PILA).

## VII. Efficiency of Proceedings

50.     Owing largely to the fragmented federal structure of the Swiss judicial system, there are no reliable statistics which would enable to assess precisely the efficiency of proceedings on a national scale. Once again, the central arenas of judicial activity are the cantons. The number of cases that reach the Supreme Court is not relevant.

51.     Duration is an indicator. Statistics for 2009 show that the average duration for a civil case, from preliminary proceedings to final award (without appeal), is just over seven months. With appeals, the average duration is nearly two years. These numbers need of course to be qualified, since duration averages will differ depending on the type of proceedings. On a general level, it is common knowledge that Geneva has a comparatively high rate of civil (and criminal) cases being filed every year before the courts. This is to some extent due to Geneva being the locus of a great number of registered offices for multinational companies. However, since 2008, owing to reform, the number of civil cases has been much more manageable.

## VIII. Swiss Substantive Law

52.     The Complaint is based on an alleged breach of duties owed to the Plaintiffs, including fiduciary duties, (i) to conduct due diligence and provide them with accurate and complete information about the Plaza Fund in relation to Madoff's fraudulent schemes, (ii) to exercise due care with respect to Plaintiffs' investment, (iii) to safeguard their assets against the Madoff/Ponzi scheme, and (iv) to inform the Plaintiffs

about the risks inherent to Madoff's operations. Consequently, the Plaintiff's claims include fraud, breach of fiduciary duty, negligent misinterpretation, gross negligence, negligence, third-party beneficiary breach of contract, unjust enrichment, aiding and abetting fraud, and aiding and abetting negligent misinterpretation.

53.     All these claims may be addressed under Swiss law. A civil claim under Swiss law will be based mainly on contract, tort or unjust enrichment. It may be paralleled with a criminal complaint, for instance fraud or criminal mismanagement. In certain circumstances, both tort and contract claims may be combined or cumulated.

54.     Under Swiss law, Plaintiffs could bring claims and, if successful, obtain relief, based on the conduct and theories alleged in the Complaint. Swiss courts mainly award compensatory damages, but other forms of relief are available in appropriate circumstances. For example, restitution is possible in cases of unjust enrichment. Neither punitive damages nor consequential damages are provided by Swiss law.

55.     The Swiss legal notion of compensatory damages, whether based on contract or tort claims, rests on the same all-encompassing definition: it is the difference between what the Plaintiff's position is as a result of the tortuous conduct or the breach of contract and what it would have been without it. For the record, one may add that damages may in theory also be awarded in the absence of material or financial damage, what is known under Swiss law as "moral tort". Swiss jurisprudences provides a maximum of approximately CHF 100'000.-.

### a. Tort Claims: Fraud, Negligence, & Gross Negligence

56.     Tort claims are addressed through the general provisions of the Swiss

Code, irrespective of whether one is dealing with fraud, negligence or gross negligence.

All these categories would, under Swiss law, be considered as variations of an unlawful

act having been committed by negligence or willfully.

57.     Indeed, Article 41 par. 1 of the Swiss Code of Obligations (hereinafter:

"CO") provides that[5]:

> Any person who unlawfully causes loss or damages to another, whether
> willfully or negligently, is obliged to provide compensation.

58.     In order to succeed on a claim based on tort, Article 41 CO requires simply

that a plaintiff state and prove the existence of the following:

- an unlawful act by the defendant;

- damages suffered by the plaintiff;

- a fault by the defendant (which includes negligence or even gross
  negligence);

- a causal link between the unlawful act and the damages incurred by the
  Plaintiff.

59.     An act leading to pure economic loss is unlawful if the defendant violated

a provision of Swiss law that (1) prohibits a certain behavior and (2) has the very purpose

of protecting the economic interests that have been harmed[6].

---

[5] This English translation is provided by the Swiss government on its website
(www.admin.ch/ch/e/rs/220/a41.html) for informational purposes only.

60.     One such provision is Article 146 par. 1 of the Swiss Criminal Code,

which relates to fraud (a felony under Swiss law), and reads as follows[7]:

> Any person who, with a view to securing an unlawful gain for himself or
> another, willfully induces an erroneous belief in another person by false
> pretences or concealment of the truth, or willfully reinforces an erroneous
> belief, and thus causes that person to act to the prejudice of his or
> another's financial interests, shall be liable to a custodial sentence not
> exceeding five years or to a monetary penalty.

61.     Article 146 of the Swiss Criminal Code is one of the provisions from the

Swiss Criminal Code that may lead to the realization of an unlawful act under CO Article

41, thereby giving rise to civil liability.

62.     Misrepresentations and omissions made to attract investors and/or to

induce them to hold investments may also satisfy the conditions set by Article 146 of the

Swiss Criminal Code.

63.     The damages available on a civil basis would correspond to the financial

prejudice incurred by the criminal conduct. If, for example, a person lost three million

USD as a result of having been criminally induced into acting against his or her own

financial interests, the damage available would be in that same amount.

64.     To sum up, I conclude that all the tort claims put forth by the Plaintiffs -

fraud, negligence, and gross negligence - have counterparts under Swiss law and that, if

Plaintiffs prove their allegations, they would be entitled to relief in the Swiss courts.

---

[6] This principle has been confirmed many times by the Swiss Supreme Court. *See, e.g.,* ATF 133 III 323;
ATF 129 IV 322, c.2.2.2., ATF 119 II 127 c. 3.
[7] This English translation is provided by the Swiss government on its website
(www.admin.ch/ch/e/rs/311_0/a146.html) for informational purposes only.

### b. Breach of Fiduciary Duty and Breach of Contract

65.    As mentioned above, under Swiss law, the breach of a contract, and more specifically the breach of the fiduciary duty owed by the manager of assets to a client, may lead to the duty to indemnify the aggrieved party for the losses that result. Article 97 CO is to a claim based on a breach of contract what Article 41 CO is to a claim based on tort. In order to succeed on a claim based on breach of contract, a plaintiff must state and prove the following elements:

- a breach of the contract (or of the duties stemming from the contract) by the defendant;

- damages suffered by the injured person/plaintiff;

- a fault from the defendant (which includes negligence or even gross negligence);

- a causal link between the breach of the contract (or of the duties) and the damages.

66.    It is worth highlighting the fact that, under Swiss law, the notion of the "third-party beneficiary" does exist (*see*, *inter alia*, Article 112 CO), but will depend on the content of the contract that allegedly confers rights to third parties.

67.    For these reasons, I conclude that the claims for breach of fiduciary duty and breach of contract have counterparts under Swiss law and that, if Plaintiffs prove their allegations, they would be entitled to relief in the Swiss courts.

### c. Unjust Enrichment

68. According to Article 62 CO:

> A person who has enriched himself without just cause at the
> expense of another is obliged to make restitution.
>
> In particular, restitution is owed for money benefits obtained for no
> valid reason whatsoever, for a reason that did not transpire or for a
> reason that subsequently ceased to exist.

69. Article 62 supposes that the plaintiff was damaged in an amount equal to
the enrichment of the defendant. A fault of the defendant is not required. However, such
enrichment must have taken place "without a cause".

70. An action based on Article 62 is very often considered to be subsidiary to
the other types of actions[8].

71. In contract cases, unjust enrichment is not "without a cause" but results
from the contract and should therefore be treated in light of the rules related to contract
claims.

72. In tort cases, the unjust enrichment may be pleaded in addition to a tort
claim but will generally result in the same relief, since both unjust enrichment and
compensatory damages require a loss affecting the victim's financial situation.

73. Unjust enrichment rules may, however, enable the plaintiff to be
compensated for a loss in situations where nothing justifies the enrichment of the
defendant even though there was no unlawful act or fault.

---

[8] Pierre ENGEL, Traité des obligations en droit suisse, 2ème édition, Berne 1997, p. 596.

74.     For these reasons, I conclude that Count XXII has a counterpart under
Swiss law and that, if Plaintiffs prove their allegations, they would be entitled to relief in
the Swiss courts.

## IX.    Switzerland's Interest in this Dispute

### a. Swiss Sovereign Interests in Evidence-Gathering and Discovery

75.     As noted above, Switzerland subscribes to the typical civil law view that
the taking of evidence is essentially a judicial function to be carried out by domestic
courts. Accordingly, if parties to a litigation outside of Switzerland wish to obtain
discovery in Switzerland, such discovery can only occur through the Swiss courts. Should
evidence be taken by a foreign authority or by parties to a foreign proceeding without the
participation or consent of the host country, the sovereignty of the host country would be
considered to have been violated.

76.     Accordingly, Switzerland has enacted Article 271 of the Swiss Criminal
Code, which prohibits the taking of evidence on Swiss territory by foreign officials and
attorneys as well as the request for, or production of, documents by mail or through Swiss
lawyers.

77.     Article 271 of the Swiss Criminal Code prohibits the taking of any
evidence in Switzerland without authorization (e.g., depositions would not be allowed in
Switzerland for use in a U.S proceeding unless the Hague Evidence Convention
procedures are followed). Based on a foreign request, the taking of evidence would be
ordered by the appropriate Swiss cantonal court and performed under its supervision. The

examination of a witness would be conducted by a Swiss judge. The parties to the U.S.
action and their attorney could attend the judicial examination and could submit questions
to the Swiss court to be presented to the witness. These rules would apply equally to both
the hearing of parties and the hearing of third-party witnesses.

78.    In short, efforts by a U.S. litigant to gather evidence in Switzerland for use
in a U.S. proceeding would not be permitted in Switzerland without extensive oversight
by a Swiss court[9].

### b. Switzerland's Interest in Regulating Financial Services Companies

79.    Switzerland's economy is based predominantly on the financial services
sector, and the country has a strong national interest in regulating financial service
companies located in Switzerland. One indicator of this is seen in the fact that although
the Swiss economy and political environment is known to be liberal (in the economic
sense), markets are closely monitored, notably by such institutions as the Swiss Financial
Market Supervisory Authority (FINMA).

80.    Corporate and financial accountability is also a major and constant
concern to policymakers, who hope that Switzerland stays attractive to foreign investors.

81.    Consequently, when claims filed against Swiss financial services
companies appear to be justified or substantiated, the Swiss courts tend to be quite strict
in favor of the plaintiffs.

### c. Litigation Related to Madoff Is Pending in Switzerland

---

[9] On those issues, reference is also made to my two declarations dated June 2 and 23, 2010.

82. It is common knowledge that civil and criminal cases concerning Madoff-related investment issues are pending in Switzerland, and in particular in Geneva.

83. This common knowledge derives mainly from the media[10], which has widely reported on such claims being filed before the Swiss courts. However, public access to these claims and to related discovery is not possible owing to the rules of privacy which apply in Switzerland.

84. This being said, the Swiss courts would be perfectly well positioned to address this Complaint, insofar as it involves a Madoff-related investment issue.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed in Geneva, Switzerland on this 28th day of January 2011.

Maurice Harari

---

[10] For instance: "*L'affaire Madoff rebondit à Genève, où une enquête pénale est ouverte*"; article published on March 3, 2009 in the daily Swiss newspaper *24 heures*.