Joseph P. Moodhe
Shannon Rose Selden
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, New York  10022
Tel.:  (212) 909-6000
Fax:  (212) 909-6836
jpmoodhe@debevoise.com
srselden@debevoise.com

*Counsel to Defendants Notz, Stucki
Management (Bermuda) Limited, and Notz,
Stucki & Cie S.A.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------x
:
:
MATIAS ERAUSQUIN, et al.,        :
                Plaintiffs,        :
    v.        :  No. 09 Civ. 7846 (WHP)
                :  **ECF CAS**
NOTZ, STUCKI MANAGEMENT        :
(BERMUDA) LIMITED, et al.,        :
:
                Defendants.        :
:
-----------------------------------------------------------------------x

### REPLY DECLARATION OF MAURICE HARARI ON SWISS LAW

Maurice Harari, pursuant to 28 U.S.C. § 1746, declares the following:

## I. Summary of Conclusions

Although my conclusions will be addressed more extensively below, I will provide here a short summary of my opinion:

- Security for fees and costs would not be a bar to bringing this action in Switzerland. The administrative court fees are overstated by the Plaintiffs' expert and, in any event, Swiss courts have the discretion not to impose such fees if they are a hardship. Assuming they are citizens of Argentina, Plaintiffs would not be required to post security for costs due to an international treaty to which both Argentina and Switzerland are parties; moreover, security is imposed only at the request of defendants and can be waived.

- The statutes of limitations would not bar Plaintiffs from bringing this action in Switzerland. The statute of limitations likely has been tolled due to the pending litigation in the U.S. In any case, Plaintiffs would have at least 60 days to re-file if the US court dismissed this case for *forum non conveniens*. Furthermore, the statutes of limitations defense has to be raised by the Defendants and can be waived.

- The effect of the criminal case against Notz Stucki & Cie and Marc Hoegger has been overstated and would not preclude this action in Swiss courts. The only issue decided by the court was that Marc Hoegger and Notz Stucki & Cie would not be held liable for the criminal accusations against Notz Bermuda, which was not a party to the proceeding. The finding would have minimal persuasive value in a civil proceeding.

- The laws of several jurisdictions could apply to this dispute, including BVI, Bermuda or Switzerland. I do not believe that New York law would apply to any of the claims.

- Criminal pleas in the United States may be produced in a Swiss action as means of evidence.

2

II.   **Court Fees and Securities for Costs**

1. I disagree with the presentation made by Me VAN STIPHOUT in an attempt to show that financial issues would constitute an obstacle to the access of justice in the Canton of Geneva.

2. There are two different issues, which should be distinguished: (A) the advance for court's fees and (B) security for the defendant's costs.

   a.   **Advance for the Court's Fees**

3. According to both article 98 of the Swiss Civil Procedure Code (hereinafter: "CCP") and art. 2 para 1 of the Geneva Regulation Fixing the Tariff in Civil Proceedings (hereinafter: "the Geneva Tariff Regulation") an **advance for court fees** may be requested by the court from any claimant, whether Swiss or foreign.

4. The amount of the advance for court fees depends, however, on *both* the financial situation of the claimant and the amount at stake in the case.

5. If the claimant's financial means are not sufficient to enable him to support the costs of the proceedings, judicial assistance may be requested which will lead to free legal assistance and cost-free access to the court (see articles 117 CCP and following). In the absence of judicial assistance, the advance payment may be equivalent to the total of the estimated court fees.

6. The rule governing court fees is not mandatory. Both article 98 CCP and article 2 para 1 of the Geneva Tariff Regulation use the term "may" which gives the court discretion. The court is free, for reasons of equity, to reduce the amount of the advance court fees (David HOFMANN / Christian LUSCHER, le Code de procedure civile, Berne, pages 60 and 61).

3

7. Even if the claimant does not qualify for judicial assistance, the courts are obligated to waive the fees if the claimant's financial situation is fragile. As it has been expressly stressed by the Swiss Federal Council during the legislative process: "Otherwise, the advance required would be prohibitive and would undermine the right of access to justice." (Message from the Federal Council dated 18 November 1998, Page 66)[1].

8. This principle has been codified with article 15 para. 5 of the Geneva Law of Application of the Swiss Civil Code and other Federal Acts in Civil Matters (hereinafter: "LACC"), which provides that: "once calculated, the court fees might be suppressed or reduced to take into account the endeavors of the parties to settle amicably their litigation or when other particular reasons justify it."

9. In addition, to guarantee the right of access to justice, art. 103 CCP provides that the decision related to the advance for costs is subject to an immediate appeal before the superior court.

10. Article 17 of the Geneva Tariff Regulation provides a scale framework, which leaves the court with discretion to fix the costs depending on the circumstances of the case:

| Amount at stake | Basic Flat Rate Fee |
| --- | --- |
| Up to CHF 10'000 | from CHF 500 to CHF 2'000 |
| from CHF 10'001 to CHF 30'000 | from CHF 1'000 to CHF 3'000 |
| from CHF 30'001 to CHF 100'000 | from CHF 2'000 to CHF 8'000 |
| from CHF 100'001 to CHF 1'000'000 | from CHF 5'000 to CHF 30'000 |
| from CHF 1'000'001 to CHF 10'000'000 | from CHF 20'000 to CHF 100'000 |
| from CHF 10'000'000 onwards | from CHF 100'000 to CHF 200'000. |

---

1  Free translation.

4

11. Article 5 of the regulation provides that, in determining costs, the court should consider within the scale different factors including, *inter alia*, the interests at stake, the complexity of the claim, the magnitude of the procedure or the importance of the work accomplished by the court.

12. In such a context, it is quite obvious for me that the first table included in Me VAN STIPHOUT's affidavit is incorrect. In particular, Me VAN STIPHOUT could not systematically choose the basic flat rate fee of CHF 30'000 (which represents *the maximum* the court can request for an amount at stake of CHF 1'000'000) for lower amounts of claim such as CHF 200'000, CHF 300'000 or CHF 500'000.

13. Similarly, Me VAN STIPHOUT could not take the basic flat rate fee of CHF 100'000 (which represents *the maximum* the court can request for an amount at stake of CHF 10'000'000) for a lower amount of claim such as CHF 1'100'000.

14. In addition, there is no reason to add to the single action of each plaintiff the "additional fee for multi-party-proceedings" provided by art. 13 of the Geneva Tariff Regulation. Quite obviously, such a fee would only be added when at least two or more plaintiffs are acting together. In that case, the amounts at stake for each of them should first be aggregated for the sake of the basic flat rate fee calculation, from which the 20% multi-party proceeding fee may be calculated.

15. Finally, I do not think we should take into consideration at this stage a possible application of article 6 of the Geneva Tariff Regulation, which gives the court discretion to double the basic rate fee. First, this provision would apply only in exceptional cases (in that respect, article 15 para. 4 LACC refers expressly to the necessity of *"particular motives"*). Second, the text of article 6 of the regulation shows that, unless an

5

exceptionally high amount is at stake, such an increase may take place only at the end of the proceedings, when it can be observed that the cause implied a particularly important work for the court, that the claim of a party was excessive or when the particular behavior of a party complicated the proceedings unnecessarily or inappropriately.

16. For all those reasons, I am quite convinced that should a Geneva court calculate the fees the way Me VAN STIPHOUT did in his first table, the claimants would be successful in appealing the imposition of costs before the superior court.

17. Since the Geneva Tariff Regulation is new and Geneva practitioners do not have any experience with its application, I have asked informally the Tribunal of First Instance of Geneva about the way the hypothesis provided by Me VAN STIPHOUT would be taxed. I was provided with the method by which the court intends to tax the advance for court fees in the future, based on their internal directives. I have also been informed that such directives should soon be posted on the court's website.

18. On that basis, if I were to calculate the expected advance for court fees in the present case – and without taking into account the personal financial situation of each claimant – fees would be as follows:

| In CHF | Plaintiff 1 | Plaintiff 2 | Plaintiff 3 | Plaintiff 4 | All together acting jointly |
|---|---|---|---|---|---|
| Amount at stake (art. 96 CCP) | 100'000 | 200'000 | 300'000 | 500'000 | 1'100'000 |
| Basic flat rate fee (art. 17 reg.) | 5'000 (at 100'001 the fee becomes CHF 10'000) | 10'000 (at 250'001 the fee becomes CHF 20'000) | 20'000 | 20'000 (at 500'001 the fee becomes CHF 30'000) | 40'000 (at 1'000'001 the fee becomes CHF 40'000) |
| Additional fee for mult. party proceedings (art. 13 reg.) (20% increase) | | | | | 8'000 |
| Total | 5'000 | 10'000 | 20'000 | 20'000 | 48'000 |

19. In conclusion, the advance for court fees should represent in the hypothesis provided by Me VAN STIPHOUT a maximum amount included between CHF 48'000 and CHF 55'000, depending on whether the Plaintiffs act jointly or not.

### b. Advances for the Parties' Costs

20. In addition, it is correct that the court can require parties requesting the taking of evidence to post an advance for court costs. When both parties have offered the same evidence, they should each advance half of the costs (article 102 CCP). I do not have any

7

major objection as to the second table of Me VAN STIPHOUT's affidavit, which seems to summarize correctly the amounts that could be granted.

21. However, I do not concur with Me VAN STIPHOUT's conclusion that, before dealing with the complaint, the court would automatically require plaintiffs to provide security for costs because they reside outside of Switzerland.

22. First of all, unlike the advance for court fees, the security for costs is ordered by the court only if it has been expressly *requested* by the defendant (art. 99 para. 1 CCP). The defendant may waive – even in advance – the requirement that plaintiffs post security.

23. Second, if such a request is filed by the defendant, the claimant could object. In particular, the security for costs may be ordered *only* in the followings circumstances (art. 99 CCP):

   - the claimant is not domiciled in Switzerland,
   - the claimant appears insolvent, in particular where it is the object of bankruptcy or administration proceedings or where certificate of loss in insolvency proceedings are outstanding,
   - the claimant owes costs from previous proceedings,
   - there are other grounds for assuming that the claim for party costs is at risk.

24. Third, Art. 2 CCP requires the court to waive security for costs if the claimant resides in a country that has certain international agreements with Switzerland. Switzerland is bound by multiple international agreements – whether bi- or multilateral – according to which the State Members agree that their nationals should be exempt from providing security for costs on the sole condition that they be domiciled or a resident in the territory of one

State Member. For instance, article 17 para 1[2] of the Hague Convention of Civil Procedure dated 1 March 1954 (RS 0.274.12) provides that:

> No security, bond or deposit of any kind, may be imposed by reason of their foreign nationality, or of lack of domicile or residence in the country, upon nationals of one of the Contracting States, having their domicile in one of these States, who are plaintiffs or parties intervening before the courts of another of those States.

25. It is worthwhile underlining that more than fifty countries are parties to that convention, including both Switzerland and Argentina. The treaty has been in force in those two countries respectively since 5 July 1957 and 9 July 1988.

26. Therefore, assuming that the claimants in the present cause are Argentinean and are domiciled or reside in that country or in any other country which signed the treaty, the defendants are precluded by treaty from obtaining security for costs based on the claimants' foreign domicile.

27. I underline that in order to guarantee the abovementioned rules, art. 103 CCP provides that the decision related to the security for costs is subject to an immediate appeal before the superior court.

## III. Statutes of Limitations Under Swiss Law

28. It is correct that, under Swiss law, a claim based on tort or on unjust enrichment would be barred one year from the date at which the person suffering the damage learned about both the damage and the identity of the person liable for it. (In contrast, the statute of limitations for breach of contract is ten years.) It is also correct that according to art. 60

---

[2] Translation from the permanent bureau of the Hague conventions provided on the following website: http://www.hcch.net/upload/conventions/txt02en.pdf.

para. 2 of the Swiss Code of Obligations (hereinafter: "CO") the statute of limitation may be extended if the claim results from an act that is illegal under criminal law.

29. This being said, I do not agree that the present case would be barred by the statute of limitation.

30. First, Me VAN STIPHOUT omits to refer to article 142 CO according to which the judge is not allowed to consider *ex officio* the expiration of the period of limitation. Only the defendant, and not the judge, can raise a statute of limitation defense. As a result, the defendant may waive such means of defense (art. 141 CO).

31. Moreover, Me VAN STIPHOUT omits to say that the running of the statute of limitation may be **tolled** through certain actions of the claimant such as bringing suit in court against the defendant (art. 135 para. 2 CO). According to article 137 para 1 CO[3], "with the interruption, the time period of the statute of limitation starts anew". According to article 138 para 1 CO, "if the running of the limitation period is interrupted by bringing suit, or raising a defense, the limitation period will start anew during the course of the litigation, with any judicial act of the parties and with any ruling or decision of the judge".

32. According to article 139 CO: "if a complaint or a defense has been rejected for reasons of lack of jurisdiction of the judge, or because of a correctable mistake, or for being filed too early, a new time period of sixty days will start to run for the assertion of the claim if the period of limitation has expired in the meantime".

33. The **filing of a suit abroad** also interrupts the statute of limitation should the foreign court be competent and the suit's formal conditions fulfilled (Pascal PICHONNAZ,

---

3   The present translations in English of articles 137, 138 and 139 CO are provided by the Swiss-American Chamber of Commerce (third revised edition) and have no legal force.

Commentaire Romand, Code des Obligations 1, ad. Art. 135 N° 19; Bernard DUTOIT, op. cit., ad art. 148 PILA, N° 4).

34. Assuming that the foreign court is incompetent over the case, the claimants should benefit from the safeguard provided by article 139 CO, applicable by analogy, which authorizes the claimant to file his claim before the competent foreign judge or Swiss judge within sixty days (Pascal PICHONNAZ, op. cit., ad Art. 135 N° 19).

35. In the present case, since, as underlined by Me VAN STIPHOUT, although BMIS's fraud became public on 11 December 2008, more than a year ago, the running of the statute of limitation has been tolled with the filing of the class action complaint on September 9, 2009.

36. I am not convinced that a refusal of a US court to take over the matters based on the *forum non conveniens* doctrine would be considered by the Swiss jurisdictions as a case of "incompetence of the foreign court"—which would be required to find that the statute of limitations had not been tolled by the U.S. filing. It seems that the *forum non conveniens* doctrine allows the US court simply to determine whether the forum is appropriate for the litigation. For that reason, it is my opinion that a Swiss court would not consider, from a mere procedural point of view, that a formal condition to the suit was lacking. Regardless, even if the U.S. court was considered incompetent, the Defendants would have the 60 days provided by article 139 CO to file their suit in front of the competent Swiss courts.

37. For all those reasons, I strongly believe there is no statute of limitations bar in the present case.

11

IV.    **The Prosecution**

38.    It is correct that damages in the form of a pure economic loss, such as in the present case, gives rise under Swiss law to a claim for compensation based on tort only on the condition that the economic loss be the result of a behavior prohibited by a specific provision or a general rule aiming at the protection of personal economic interests.

39.    The prohibition provision may very well lie in a general unwritten principle or be incorporated in a civil, administrative or criminal set of rules (Franz WERRO, Commentaire Romand, Code des Obligations I, ad art. 41 CO, N° 56).

40.    As underlined in my previous statement, articles 146 or 158 of the Swiss Criminal Code (hereinafter: "CP"), prohibiting respectively fraud and mismanagement, do constitute such provisions.

41.    These are, however, not the only provisions prohibiting behaviors that give rise to claims for compensation. I am quite convinced for instance that a violation of article 149 of the Swiss Federal Act on Collective Investments (RS 951.31), prohibiting, whether intentionally or carelessly, the publication of incorrect or misleading information related to a Swiss or foreign collective investment, may also constitute such a provision.

42.    In addition, in order to overcome the limits resulting from the requirement of a specific norm prohibiting a given behavior, the Swiss Supreme Court relies sometimes on the **principle of the good faith** in order to recognize civil liability.

43.    Within that context, the Swiss Supreme Court considers that anyone who provides **incorrect information**, whether intentionally or carelessly, or does not mention facts known to be of importance to the other party, may be liable under article 41 CO (Franz WERRO, op. cit., ad Article 41 CO, N° 64).

44. In a very well known decision dated 15 November 1994, the Swiss Supreme Court went one step further in recognizing that in the absence of breach of contract or tort, a holding company (i.e. the former airplane company Swissair) might be liable for the damages generated by a breach of its duty to properly inform the clients and creditors of the group about its real financial situation. In that case, the holding company was deemed liable for creating confidence and hope in a manner contrary to the good faith among the clients and creditors of the subsidiary (ATF 120 III 331 = JdT 1995 I 359).

45. In sum, contrary to what Me VAN STIPHOUT says, the plaintiff does not need to convince the civil court that the defendant had actually engaged in criminal activities. *A fortiori*, it is not necessary that the offender be subject to criminal proceedings or convicted.

46. Furthermore, article 53 CO[4] stresses the principle of the independence of the civil judge, who is not bound by a prior criminal judgment of acquittal:

    When determining fault or lack of fault and capacity or incapacity to consent, the court is not bound by the provisions governing criminal capacity nor by any acquittal in the criminal court.

    The civil court is likewise not bound by the verdict in the criminal court when determining fault and assessing compensation.

47. In the present case Me VAN STIPHOUT tries to infer from the decision of the Prosecuting Chamber of the Canton of Geneva (acting as an appellate court) dated 24 February 2010 (hereinafter: "the decision"), confirming the Investigating Magistrate's decision refusing to prosecute Notz Stucki SA and Mr. Marc Hoegger, that the Swiss civil courts would be likely to dismiss an action by the Plaintiffs against the Defendants.

---

[4] This translation is provided for information purposes only on the website of the Swiss government (http://www.admin.ch/ch/e/rs/220/a138.html) and has no legal force.

48. I do not agree with him. In that criminal litigation, four investors in Plaza International Investment Ltd (hereinafter: "Plaza") filed a criminal complaint against Notz Stucki SA in Geneva in an attempt to have the company held accountable for the acts committed by Notz Stucki Bermuda, as the manager of Plaza. According to the complaint, the two companies should have been considered as a single one from the perspective of criminal law. In other words, the Plaintiffs requested that the court "lift the corporate veil."

49. In that context, the Plaintiffs argued that false public information was provided in the Plaza prospectus published in 2002 and 2008. The Plaintiffs alleged that such information persuaded them to invest in the Plaza fund, which was a decision detrimental to their interests. Moreover, the plaintiffs criticized the Plaza fund's management.

50. In the decision, the Prosecuting Chamber evaluated the case through criminal law article 102 CP, which **restricts** when a company can have criminal liability. It is worth underlining that under this provision, criminal liability of a company may be held only on the following cumulative conditions:

    – a felony or misdemeanor has been committed within a company,
    – such felony or misdemeanor took place in the exercise of commercial activities in accordance with the objects of the company,
    – it is not possible to attribute this act to any specific natural person due to the inadequate organization of the company.

51. As underlined by the court, those objective conditions of accountability are mainly designed to avoid plaintiffs suing companies for the criminal behavior of a natural person.

52. Similarly, the Court examined the potential criminal liability of Mr. Marc HOEGGER through a specific provision (article 29 CP) which limits when a natural person, acting as an officer of the company, may be held criminally liable. As stressed by the court in the decision, article 29 CP presupposes the application of article 102 CP.

53. The Court refused to disregard the corporate structure. After having underlined the fact that Notz Stucki SA and Notz Stucki Bermuda were distinct companies both from a financial perspective and from an administrative one (they had only one governing officer in common), the court concluded that Notz Stucki SA did not present an inadequate organization. Besides, the court stressed that Notz Stucki SA – in contrast to Notz Stucki Bermuda – was not the manager of Plaza. Therefore, neither the conditions of art. 102 CP nor those of article 29 CP were met.

54. In sum, the scope of the decision is **very narrow**, since the examination of the facts by the criminal court was limited (1) to the possible criminal liability of Notz Stucki SA as a company (neither UBSL not Notz Stucki Bermuda were directly concerned by the complaint), (2) to the criminal accountability of Notz Stucki SA for the acts accomplished by its sister company, i.e. Notz Stucki Bermuda and (3) to the criminal accountability of Mr. Marc Hoegger, as a governing officer of Notz Stucki SA, for the criminal liability of the Swiss company.

55. In other words, the Plaintiffs' very particular task – at which they failed – was to obtain in criminal matters the lifting of the corporate veil between the two sister companies in an area where the liability of companies itself is very limited and subsidiary to personal liability.

56. It is of course not my goal at this stage to convince anyone that the Plaintiffs would actually be successful in a civil action against the Defendants in Switzerland. Nevertheless, it seems quite obvious to me that the decision in no way addresses any aspect of UBSL and Notz Stucki Bermuda's liability. As for Notz Stucki SA, the decision is exceedingly narrow and in particular would not preclude the Claimants from relying on other prohibition provisions or general rules of behavior, including the principle of good faith to establish a basis for the company's civil liability. For all those reasons, I cannot concur with Me VAN STIPHOUT's conclusion that, on the basis of the decision dated 24 February 2010, Swiss civil courts would be likely to dismiss an action by the Plaintiffs against the Defendants.

## V. Law Applicable to the Dispute

57. Article 132 of the Swiss Federal Act on Private International Law (hereinafter: "PILA") allows the parties to agree, at any time after the damage occurred, to apply Swiss law to their litigation. Therefore, the parties are free to designate Swiss law as the law applicable to the claims at stake. It is only in the absence of such choice of law that the judge may apply article 133 PILA.

58. Art. 133 para. 1 PILA is not applicable to the present case since it requires that both the claimant and the defendant reside in the same country.

59. According to art. 133 para. 2 PILA, the tort claim is governed by the law of the state in which the tort was committed. However, if the result occurred in another state, the law of such state applies should the tortfeasor have foreseen that the result would occur there.

16

60. In the present case, art. 133 para 2 first sentence PILA, read in conjunction with art. 140 PILA[5], may require a court to apply different laws to different claims depending on where each Defendant acted (for instance Switzerland for NOTZ STUCKI SA, Bermuda for NOTZ STUCKI Bermuda and Luxembourg for UBSL). This is why the Swiss courts will tend to apply, in accordance with the second sentence of art. 133 para. 2 PILA, the law of the state in which the result occurred as the law applicable to the whole case.

61. I agree with Me VAN STIPHOUT that in the case of damages caused to financial assets of a person, the place where the damage materialized is the place where the assets were located (see the decision of the Swiss Supreme Court dated 2 November 1998 and published in ATF 125 III 103 = JT 2000 I 362).

62. However, I do not agree with his interpretation that the location of the assets would be defined as where the assets ended up. As a matter of fact, in the abovementioned decision, the Swiss Supreme Court underlined that *the place of the result* is where the assets were initially located, i.e. where the *first* unlawful prejudice took place. In case of fraud, the place of the result is where the victim disposed of its assets against its interests (ATF 125 III 103 = JdT 2000 I 362) (act of disposal at the origin of the damage).

63. This is why, in contrast to Me VAN STIPHOUT, I do not consider that in the present case the applicable law would be New York law. The reasoning of Me VAN STIPHOUT (i.e. that the claimants' assets "were systematically wired to Bernard L Madoff Investment Securities LLC's ("BMIS") bank accounts located in New York") omits to take into consideration the fact that the investors initially acquired shares of Plaza, and that it was this acquisition that created their damage. Thus, the place where the result

---

5   According to Article 140 PILA, if several persons have taken part in the commission of a tort, the applicable law shall be determined separately for each one of them regardless of their role.

17

occurred should be, in my opinion, the place where the Plaza's shares where bought and held by the investors, which might be Switzerland for many – but not New York, since all shareholders are outside the US..

64. Finally, I doubt that Swiss courts would apply the law of the residence of each claimant, as contended by Me VAN STIPHOUT. Indeed, in the abovementioned decision, the Swiss Supreme Court stresses that in case of pure economical prejudice, as is the case here, the place of the result does not match necessarily with the residence of the victim (ATF 125 III 103 = JT 2000 I 362).

65. According to art. 133 para. 3 PILA, notwithstanding art. 133 par. 1 and 2 PILA, when a tort breaches a legal relationship existing between the person causing the damage and the person suffering from it, claims based on such a tort are governed by the law applicable to the said legal relationship. The aim of that provision is to apply to the relationships between the parties the law they should have **expected**. As a result, art. 133 para. 3 PILA applies not only to parties linked by *direct* contractual relationships but also to parties linked by *indirect* legal relationships (Bernard Dutoit, Droit international privé, 4ème edition, ad. Art. 133 PILA N° 9).

66. As is underlined by Me VAN STIPHOUT, the claimants are neither parties to the custodian agreement between Plaza and UBSL, nor to the investment management agreement between Plaza and Notz Stucki Bermuda nor to the service agreement between Notz Stucki SA and Notz Stucki Bermuda. However, the claimants are bound by agreements with Plaza. On the basis of these agreements, and as investors of the company, they would be required to seek the protection of the laws applicable to Plaza. Apparently, the agreements do not contain a governing law provision.

18

67. Article 154 para. 1 PILA provides that companies are governed by the law of the state under which they are organized, which, in the case of Plaza, is the **BVI**. According to Swiss scholars, the scope of the applicable law to a company must be conceived in the broadest way possible in order to encompass all the issues of corporate law, whether related to internal or external relationships (DUTOIT, op. cit., ad Article 155 N° 1).

68. According to art. 155 let. g PILA, this extends *inter alia* to the liability for the violation of company law provisions, which includes the liability of the persons involved in the creation, management and liquidation of the company vis-à-vis third parties (DUTOIT, op. cit, ad art. 155 PILA N° 9), such as creditors and investors.

69. In addition, according to art. 156 PILA, claims arising from public issues of equity or debt securities by means of prospectuses, offering memoranda or similar notices, are governed either by the law applicable to the company or by the law where the issue takes place.

70. Hence, the Swiss courts may choose to apply **BVI law** to the present case either through a direct application of art. 154 para. 1, 155 let. g and 156 PILA or through art. 133 para. 3 PILA, for issues related to the liability of NOTZ STUCKI Bermuda, for the management of Plaza or to the issuance of Plaza's prospectuses.

71. On the other hand, **Swiss law** will apply to issues related to the public issuance in Switzerland of prospectuses regarding investments in Plaza (art. 156 PILA).

## VI. The United States Criminal Pleas

72. According to art. 168 and 177 CCP, the parties to a civil action in Switzerland may produce as exhibits (i.e. as admissible means of evidence), any written documents which could prove a legally relevant fact.

19

73. In my opinion, a criminal plea in the United States may therefore be used as evidence in a Swiss action in order to establish that BMIS employees, such as Madoff and Frank DiPascali, have admitted falsifying BMIS records and lying to clients about the BMIS fraud.

74. The parties may directly use those admissions so that the Swiss civil courts would not have to waste time hearing evidence in order to determine that NOTZ STUCKI received fraudulent records.

75. Of course, the parties remain free to request the testimony of a witness in relation to any relevant allegation or evidence produced.

\* \* \*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed in Geneva, Switzerland on this 8th day of April 2011.

_____
Maurice Harari