UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
                                        :
MATIAS ERAUSQUIN, et al.,                          09 Civ. 7846 (WHP)
                                        :
                    Plaintiffs,                    MEMORANDUM & ORDER
                                        :
        -against-
                                        :
NOTZ, STUCKI MANAGEMENT
(BERMUDA) LIMITED, et al.,               :
                                            ┌──────────────────────────────┐
                    Defendants.          :  │ USDC SDNY                    │
                                            │ DOCUMENT                     │
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X │ ELECTRONICALLY FILED         │
                                            │ DOC #:_____        │
                                            │ DATE FILED:  8/25/11         │
                                            └──────────────────────────────┘

WILLIAM H. PAULEY III, District Judge:

        Plaintiffs Matias Erausquin, Enrique Erausquin, Liliana Controne, and Yolanda

Frischknecht bring this putative class action against Defendants Notz, Stucki Management

(Bermuda) Limited ("Notz Stucki Bermuda"), Notz, Stucki & Cie S.A. ("Notz Stucki & Cie" and

with Notz Stucki Bermuda, the "Notz Stucki Defendants"), UBS (Luxembourg) S.A. ("UBS

Luxembourg," and together with the Notz Stucki Defendants, the "Foreign Defendants"), and

Frank DiPascali, Jr. ("DiPascali"). The Complaint includes twenty-two counts of fraud,

misrepresentation, negligence, breach of fiduciary duty, breach of contract, and unjust

enrichment arising from Plaintiffs' investment in Plaza Investments International Limited

("Plaza" or the "Fund"), an investment fund in the British Virgin Islands. Plaza's assets were

invested with Bernard L. Madoff Investment Securities LLC ("BMIS") and lost after Bernard

Madoff's ("Madoff") Ponzi scheme was revealed to the world.

        The Notz Stucki Defendants and UBS Luxembourg move to (1) sever the claims

against DiPascali, (2) dismiss the Complaint on forum non conveniens grounds, and (3) dismiss

Counts 5 through 7, 9, 14 through 16, and 22 for lack of standing.  UBS Luxembourg moves

separately to dismiss the Complaint for lack of personal jurisdiction.  For the following reasons,

Defendants' motion to sever and dismiss on forum non conveniens grounds is granted.

Accordingly, this Court need not reach Defendants' other arguments.

## BACKGROUND

I.  The Parties & Relevant Third-Parties

Plaintiffs are foreign citizens who reside in Argentina.  (Amended Class Action

Complaint dated Nov. 24, 2010 ("Compl.") ¶¶ 8-11; Plaintiffs' Declaration Concerning Their

Choice of Forum dated Mar. 2011 ¶ 2.)  Plaintiffs invested in Plaza and lost their investments

after Madoff's fraud was uncovered.  (Compl. ¶¶ 8-11.)

Plaza is an investment company with its principal place of business in the British

Virgin Islands.  (Compl. ¶ 18.)  Since its inception in 1996, Plaza invested 100% of its assets

with BMIS.

Notz Stucki & Cie is an asset management company with its principal place of

business in Switzerland.  (Compl. ¶ 13.)  It is the "flagship" company of a group of Notz Stucki

entities that specialize in managing investments for private individuals and institutions (the

"Notz Stucki Group").  (Compl. ¶ 13(a).)  Among other things, Notz Stucki & Cie marketed

Plaza to potential investors, solicited investments from Plaintiffs, and "purported to oversee,

control and manage those investments."  (Compl. ¶ 14(c).)

Notz Stucki Bermuda is a Bermuda company and an affiliate of the Notz Stucki

Group.  (Compl. ¶ 14.)  Because it held all of Plaza's voting shares, Notz Stucki Bermuda

controlled the Fund's decision making. (Compl. ¶¶ 19-21.) It also served as Plaza's investment manager and, technically, was responsible for all services provided to the Fund, including the selection and supervision of the Fund's administrator, auditor, custodian, and investment advisor, BMIS. (Compl. ¶¶ 14(a) and (b).) As a practical matter, however, Notz Stucki Bermuda delegated those responsibilities to Notz Stucki & Cie, as set forth in two agreements effective January 1, 2007 (the "Agreements"). The Agreements required, inter alia, Notz Stucki & Cie to prepare periodic reports and analyses of BMIS's performance and the risks associated with its investments. (Compl. ¶¶ 33-34, 83-87.) According to the Complaint, the Agreements merely memorialized the delegation of duties that had existed among the Notz Stucki Defendants since 2000, under which Notz Stucki & Cie "exercised control and discretion over all investment management responsibilities for Plaza, including responsibility for monitoring market conditions and Plaza's investment with BMIS." (Compl. ¶¶ 34, 82.) Notz Stucki & Cie generally performed these responsibilities from its headquarters in Geneva. (Hoegger Decl. ¶¶ 20, 22.)

UBS Luxembourg is a bank with its principal place of business in Luxembourg. In April 2002, UBS Luxembourg and Plaza entered into an agreement appointing UBS Luxembourg custodian of Plaza's assets. (Compl. ¶ 15; Ex. 13: Custodian Agreement, art. II-III.) Plaza's offering documents advertised UBS Luxembourg's role, stating that it had been "engaged as Custodian to hold and maintain all cash, currency and investments of [Plaza]." (See, e.g., Compl. Ex. 1: Information Memorandum at 8; see also Compl. ¶ 52.)[1]

DiPascali was BMIS's Chief Financial Officer and helped perpetrate Madoff's

---

[1] While the Complaint attributes the representations in the offering documents to UBS Luxembourg, the parties dispute this point. (See Transcript of Oral Argument dated June 28, 2011 ("Tr.") at 46-47.) However, this issue need not be resolved to decide this motion.

fraud by fabricating account statements and trading confirmations for BMIS's fictional investments. On August 11, 2009, DiPascali pled guilty to ten felony counts and consented to the imposition of a $170.25 billion judgment against him. (See Stipulation & Order ¶¶ I-III, United States v. DiPascali, 09 Cr. 764 (RJS), (S.D.N.Y. June 16, 2010), ECF No. 64).) DiPascali is a resident of New Jersey and is currently released on bail pending sentencing. (Compl. ¶ 17(a).)

II.  The Claims

The Complaint's core allegations are that Defendants deceived Plaintiffs and/or breached their duties with respect to the performance, custody, and oversight of Plaza's investments with BMIS. (See Compl. ¶¶ 161-79, 203, 216, 240-45, 298-303.) Plaintiffs bring their claims against each Defendant individually, with the exception of their claim for unjust enrichment, which is pled against all Defendants together. As such, the unjust enrichment claim is the only claim with the potential for joint and several liability. (Compl. ¶ 332.)

As to the Notz Stucki Defendants, the Complaint alleges that they "induced Plaintiffs to invest in Plaza on the basis of uniform false and misleading representations and omissions set forth in [Plaza's offering documents]." (Compl. ¶¶ 161.) These included false statements concerning BMIS's investment strategy, the monitoring of its investments, and the custody of Plaza's assets. (Compl. ¶¶ 161-79.) The Complaint alleges further that the Notz Stucki Defendants failed to disclose numerous "red flags" associated with BMIS's trading strategy. (Compl. ¶¶ 180-81.) UBS Luxembourg also allegedly ignored these red flags and failed to properly maintain custody of Plaza's assets. (Compl. ¶¶ 180-82.)

4

III.   Witnesses and Evidence

The Complaint identifies various individuals with responsibility for selecting and monitoring investments in BMIS.  Christian Stucki ("Stucki"), the co-founder of Notz Stucki & Cie, served on the board of directors of both Notz Stucki & Cie and Notz Bermuda.[2]  (Compl. ¶¶ 13, 94.)  From approximately 1987 to 2007, Stucki also served as Notz Bermuda's Vice President.  (Compl. ¶ 94.)  Stucki resides in Switzerland.  (Hoegger Decl. ¶ 21.)  Julian Elliot, a Notz Stucki Bermuda director from 2006 to 2009 who also served as head of compliance for Notz Stucki & Cie, met with Madoff in New York.  (Compl. ¶ 31.)  While a Notz Stucki & Cie employee, Elliot resided in Switzerland.  (Hoegger Decl. ¶ 18.)  However, he left the firm and neither Plaintiffs nor Defendants identify where he currently resides.  Three other individuals— Constantin Melas-Kyriazi and Francois Delalande, former Notz Stucki & Cie directors, and Gregoire Notz, a current Notz Stucki & Cie director and son of co-founder Beat Notz—also met with Madoff regularly for due diligence purposes.  (Compl. ¶ 144; Hoegger Decl. ¶ 21, 25.)  All three reside in Switzerland.  (Hoegger Decl. ¶ 25.)

Marc Hoegger ("Hoegger"), originally a defendant in this action before being dropped from the Complaint, is the managing director of Notz Stucki & Cie and served as a director for both Notz Stucki Bermuda and Notz Stucki & Cie at various times between 2001 and 2008.  (Compl. ¶ 96; Hoegger Decl. ¶ 1.)  Hoegger was also a director of Plaza from 2000 to 2008.  (Compl. ¶ 96.)  He resides in Switzerland.  (Hoegger Decl. ¶ 25.)  On July 24, 2009,

---

[2]  While the Complaint also includes allegations concerning co-founder Beat Notz, who made the initial decision to invest with Madoff, he died prior to the filing of this lawsuit.  (Compl. ¶¶ 29-30; Hoegger Decl. ¶ 21.)

investors in Plaza[3] filed a criminal complaint with the Geneva District Attorney against Hoegger and Notz Stucki & Cie alleging "mismanagement, fraud, and [the] filing [of] false documents" in connection with losses from Madoff's fraud (the "Swiss Criminal Action"). (Declaration of Alan I. Ellman dated Mar. 18, 2011 ("Ellman Decl.") Ex. 22: Order of the Court of Criminal Appeal dated Feb. 24, 2010 (English translation) at 2.) On February 24, 2010, the Swiss Court of Criminal Appeals upheld the District Attorney's decision not to pursue criminal charges against the defendants. (Swiss Criminal Action at 15.)

Another former Notz Stucki & Cie employee, Manuel Echevarria ("Echevarria"), is featured in the Complaint. (See Compl. ¶¶ 97-117, 132-42.) Echevarria joined Notz Stucki & Cie in July 2008 after serving as the Chief Executive Officer of Optimal Investment Services ("OIS"), a hedge fund unit of Banco Santander, S.A. ("Santander"), a global financial institution headquartered in Spain. (Compl. ¶ 97.) While at Santander, Echevarria met with Madoff several times a year and received internal reports highlighting significant risks associated with BMIS's investment strategy. These included concerns that Madoff acted as both investment advisor and custodian and would not provide independent verification of BMIS's trades. (Compl. ¶¶ 101-34.) Echevarria resides in Switzerland and is currently facing criminal charges there for "criminal mismanagement." (Compl. ¶ 98; Hoegger Decl. ¶ 25.) Hugh Burnaby-Atkins ("Atkins"), another former Santander employee who moved to Notz Stucki & Cie with Echevarria, was also aware of the risks associated with BMIS. (Compl. ¶¶ 99-100.) The parties do not identify Atkins's place of residence.

The Notz Stucki Defendants identify numerous additional individuals with

---

[3] The Swiss court's order does not identify the investors but states that they are residents of Argentina. It is unclear whether Plaintiffs or other investors filed that criminal complaint.

potential discoverable information, including:

- Hilmi Unver, a Notz Stucki & Cie senior manager (Hoegger Decl. ¶ 21.);

- Cedric Dingens, a Notz Stucki & Cie employee responsible for risk management (Hoegger Decl. ¶ 21);

- Bernard Tracewski, a former Notz Stucki & Cie senior manager responsible for administration matters (Hoegger Decl. ¶ 25);

- Sanda Win, a former Notz Stucki & Cie employee who worked on oversight and administration matters related to Plaza (Hoegger Decl. ¶ 25);

- Yu Shang, a former Notz Stucki & Cie employee who analyzed Plaza's financials (Hoegger Decl. ¶ 25);

- Patrick Piralla, a Notz Stucki & Cie employee who participated in communications related to Plaza (Hoegger Decl. ¶ 25);

- Anne Castro, a former Notz Stucki & Cie employee who monitored BMIS's investments (Hoegger Decl. ¶ 25); and

- Sebastian Poiret, a Notz Stucki & Cie manager who participated in communications related to Plaza (Hoegger Decl. ¶ 25).

All of these individuals reside in Switzerland.

Notwithstanding the Complaint's identification of various Notz Stucki employees relevant to this dispute, it is silent as to UBS Luxembourg employees responsible for carrying out UBS Luxembourg's Plaza-related duties.

Although allegedly central to this dispute, DiPascali is mentioned just two times in the nearly 200 paragraphs of background allegations in the Complaint. (Compl. ¶¶ 17, 135.) Paragraph 17 briefly describes his participation in the underlying fraud and the criminal proceedings against him. (Compl. ¶ 17.) Paragraph 135 alleges that the Notz Stucki Defendants should have known of Madoff's fraud by July 2008 because of a civil complaint filed against

DiPascali by the United States Securities and Exchange Commission. (Compl. ¶ 135.) The only

other references to DiPascali arc in the substantive counts against him for fraud, aiding and

abetting fraud, and aiding and abetting negligent misrepresentation. Those counts allege that

DiPascali falsely represented BMIS's investments as legitimate, administered BMIS's fraudulent

trading strategy, and aided and abetted the Foreign Defendants' fraud. (Compl. ¶¶ 315-30.)

DiPascali has invoked the Fifth Amendment in response to each allegation. (Answer to

Amended Class Action Compl., Erausquin v. Notz Stucki Mgm't (Bermuda) Limited, No. 09

Civ. 7846 (S.D.N.Y. Dec. 8, 2010), ECF No. 60.)

    As to documentary evidence, the Foreign Defendants submit that the vast majority

of relevant documents are located in Switzerland and Luxembourg. Specifically, they submit

that because Notz Stucki & Cie operated in Switzerland, and Plaza's custodian, administrator

and auditor were all based in Luxembourg, communications and documents related to Plaza were

exchanged between those two countries. (Hoegger Decl. ¶¶ 22-24.) Many of these documents

are in French. (Hoegger Decl. ¶ 22.)

    During jurisdictional discovery, UBS Luxembourg produced approximately 300

pages of documents reflecting communications primarily with DiPascali. (Ellman Decl. ¶¶ 2-4.)

Nearly all of those documents are in English. (Ellman Decl. ¶ 5.) The parties do not describe the

quantity of documents produced by the Notz Stucki Defendants. According to Plaintiffs,

BMIS's and Madoff's records, which are located in the United States, are the most relevant

documents in this litigation.

IV.  Relevant Procedural History

On September 11, 2009, Plaintiffs commenced this action against eleven defendants, including the Foreign Defendants, DiPascali and Madoff's sons, Peter, Andrew, and Mark Madoff.  By order dated January 26, 2010, this Court permitted limited discovery on the issue of personal jurisdiction.  Over the next nine months, the parties were embroiled in a dispute over the scope of that order and Defendants' reliance on foreign privacy laws allegedly preventing them from producing documents located overseas.  On the eve of oral argument, however, the parties resolved their dispute, obviating any need for this Court to decide the foreign privacy law question.

On November 24, 2010, Plaintiffs filed an amended complaint dropping seven of the original defendants, including Madoff's sons.  Their dismissal was prompted by an application by Irving H. Picard (the "Trustee"), the trustee for Madoff's estate and BMIS's consolidated liquidation, to enjoin litigation against Madoff's sons on the grounds that it violated the automatic stay in the BMIS bankruptcy proceeding (the "Bankruptcy").  As memorialized in a January 24, 2011 stipulation, the Trustee agreed to withdraw his request for an injunction following the filing of the amended complaint in this action removing Madoff's sons as defendants.  (Stip. of Dismissal and Amendment of Caption dated Jan. 24, 2011, Sec. Investor Protection Corp. v. Madoff, 10 Civ. 3268 (BRL), ECF No. 34.)

Both the original and amended complaints invoked subject matter jurisdiction under the Class Action Fairness Act ("CAFA").  28 U.S.C. § 1332(d).  In actions where the plaintiffs are all foreign citizens, CAFA requires, inter alia, that at least one defendant be a citizen of the United States.  28 U.S.C. § 1332(d)(2)(B).  In this case, as the only Defendant who

9

is a citizen of a State, DiPascali is the lynchpin of this Court's subject matter jurisdiction.

V.  The Trustee Actions

On November 23, 2010, the Trustee initiated two adversary proceedings in the Bankruptcy (the "Trustee Actions"), bringing claims for preferential transfer, conversion, and unjust enrichment related to Madoff's fraud against, inter alia, Plaza, Notz Stucki Bermuda, and UBS Luxembourg. (Complaint ¶¶ 120-89, 199-207, Picard v. Plaza Invs. Int'l Ltd., Adv. Pro. No. 10-4284 (S.D.N.Y. Bankr.), ECF No. 1; Complaint ¶¶ 259-319, 344-52, Picard v. UBS AG, Adv. Pro. No. 10-4285, (S.D.N.Y. Bankr.), ECF No. 1.) All three entities moved to withdraw the reference to the Bankruptcy and have the Trustee's actions decided by the district court. (See Mot. Withdraw the Bankruptcy Reference, Picard v. UBS Fund Servs. (Luxembourg) SA, No. 11 Civ. 4212, (S.D.N.Y.), ECF No. 1; Mot. Withdraw the Bankruptcy Reference, Picard v. Plaza Invs. Int'l Ltd., No. 11 Civ. 5267, (S.D.N.Y.), ECF No. 1.)

In the adversary proceedings, Notz Stucki Bermuda and Plaza produced to the Trustee thirty-nine documents totaling approximately 2000 pages. (Ellman Decl. Ex. 12: Letter from S. Seldon to A. Ellman dated Mar. 14, 2011 at 1.) UBS Luxembourg produced approximately 56,000 pages. (Ellman Decl. Ex. 14: Letter from M. King to A. Ellman dated Mar. 14, 2011 ("King Letter") at 1.) According to UBS Luxembourg, the "search and review that led to this production was not targeted at locating documents relating to Plaza." (King Letter at 1.)

DISCUSSION

I.  Severance of the Claims Against DiPascali

Rule 21 permits a court to "sever any claim against a party." Fed. R. Civ. P. 21. "The decision whether to grant a severance motion is committed to the sound discretion of the trial court." State of N.Y. v. Hendrickson Bros., Inc., 840 F.2d 1065, 1082 (2d Cir. 1988); accord Wausau Bus. Ins. Co. v. Turner Constr. Co., 204 F.R.D. 248, 250 (S.D.N.Y. 2001). "Courts may order a Rule 21 severance when it will serve the ends of justice and further the prompt and efficient disposition of litigation." T.S.I. 27, Inc. v. Berman Enters., Inc., 115 F.R.D. 252, 254 (S.D.N.Y. 1987); see also In re Methyl Tertiary Butyl Ether Prods. Liab. Litig., 247 F.R.D. 420, 427 (S.D.N.Y. 2007) ("Severing the claims of the non-State plaintiffs is warranted due to principles of judicial efficiency and fundamental fairness . . . .")  While the Court of Appeals has not set forth specific criteria governing severance, courts in this District generally employ the following factors on a motion to sever:

> (1) whether the claims arise out of the same transaction or occurrence; (2) whether the claims present some common questions of law or fact; (3) whether settlement of the claims or judicial economy would be facilitated; (4) whether prejudice would be avoided if severance were granted; and (5) whether different witnesses and documentary proof are required for the separate claims.

In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig., 214 F.R.D. 152, 154-55 (S.D.N.Y. 2003) (Pollack, J.); accord Deajess Med. Imaging, P.C. v. Allstate Ins. Co., 344 F. Supp. 2d 907, 914 (S.D.N.Y. 2004).  "What will constitute the same transaction or occurrence under the first prong of Rule 20(a) is approached on a case by case basis." Kehr v. Yamaha Motor Corp., U.S.A., 596 F. Supp. 2d 821, 826 (S.D.N.Y. 2008) (citing 7 C. Wright and A. Miller Federal

11

Practice and Procedure § 1653 at 270 (1972)).

      The severance analysis begins with this Court's observation that DiPascali is essentially a nominal defendant in this action. In the nearly fifty pages of background allegations in the Complaint, DiPascali is mentioned only twice in cursory fashion. (See Tr. at 31 (offering no rebuttal to Defendants' argument concerning the scarcity of allegations as to DiPascali).) He is also subject to a $170 billion judgment, rendering him effectively bankrupt and extinguishing any possibility of recovery by Plaintiffs even if they establish liability. In addition, Plaintiffs misleadingly assert that DiPascali will be a critical witness in this litigation. DiPascali is a defendant in at least seven other civil actions, and at argument his counsel equivocated as to his participation in those actions. Indeed, while DiPascali will cooperate "to the extent he is able," his counsel described various impediments to such cooperation, including that (1) DiPascali is an ongoing cooperator for the United States, (2) the Government may move to stay his participation in any civil proceedings, (3) his sentencing remains unscheduled, and (4) he may continue to invoke his Fifth Amendment rights. (Tr. at 3.)

      With these considerations in mind, Plaintiffs' arguments with respect to the severance factors are largely illusory. Even if Plaintiffs' claims all arise out of Madoff's fraud and present common issues of fact and law,[4] resolution of these issues as to DiPascali will likely never be required. He already pled guilty to the underlying fraud, his allocution is admissible at trial, and he is judgment proof. Alternately, the claims against him may be stayed and require a resolution at a later stage. In either case, DiPascali's participation in this action is implausible and remote.

---

[4] These could include communications between DiPascali, the Foreign Defendants, and other entities, the custody of Plaza's assets, and damages calculations.

The claims against DiPascali also differ significantly from the claims against the

Foreign Defendants. First, while Plaintiffs plead a variety of claims against the Foreign

Defendants, including fraud, misrepresentation, and breach of fiduciary, the essence of each

claim is the same: that the Foreign Defendants failed to monitor and maintain custody of Plaza's

assets and misled Plaintiffs about these facts. (See, e.g., Compl. ¶ 203 (alleging fraud for falsely

representing that "the Notz Stucki Defendants would conduct oversight and due diligence");

Compl. ¶ 244 (alleging breach of fiduciary duty for failing to "take all possible steps to oversee

that the investments of [Plaintiffs'] assets . . . were made and maintained in a prudent and

professional manner"); Compl. ¶ 262 (alleging fraud for UBS Luxembourg's failure to disclose

that it "did not have custody and did not in fact hold and maintain all cash, currency, and

investments of" Plaza); Compl. ¶ 302 (alleging breach of fiduciary duty for UBS Luxembourg's

failure to "take all possible steps to oversee that the investment of the assets of Plaintiffs and the

Class were held in its own custody").) Consequently, the claims against the Foreign Defendants

focus on conduct outside the United States, including due diligence operations in Switzerland

and Luxembourg, fiduciary duties and oversight obligations established under foreign law, and

representations made to Plaintiffs regarding their investments in Plaza.

In contrast, the claims against DiPascali focus on his effectuation of BMIS's

fictitious "split-strike conversion strategy" in New York. (Compl. ¶¶ 316, 323, 328); see Sec. &

Exchange Comm'n v. Pignatiello, No. 97 Civ. 9303 (SWK), 1998 WL 293988, at *4 (S.D.N.Y.

June 5, 1998) (severance warranted in part because the "two schemes appear[ed] to require the

testimony of different witnesses and different documentary proof"). To the extent the Complaint

alleges that DiPascali aided and abetted the Foreign Defendants' conduct, those allegations are

particularly hollow. While the counts against DiPascali delineate clearly his own fraud—i.e., his execution of BMIS's fraudulent trading strategy—they offer only bare conclusions concerning the assistance he provided to the Foreign Defendants. (See Compl. ¶¶ 323-24 (stating that DiPascali "knew" that the Foreign Defendants made false representations to Plaintiffs and that he "substantially assisted" their fraud)); In re Merrill Lynch, 214 F.R.D. at 156 (severing claims in part because the "complaint['s allegations of conspiracy pled] very little in the way of concrete connection between" the defendants); see also Fed. R. Civ. P. 9(b) ("In alleging fraud . . . , a party must state with particularity the circumstances constituting fraud . . . .") Moreover, the only common witness to the aiding and abetting claims appears to be DiPascali himself,[5] whose participation in this action is unlikely. These realities belie Plaintiffs' argument that there is substantial overlap among the claims against all Defendants.

Nor is this Court required to deny Defendants' severance motion merely because there exist some common question of law and fact. The Court of Appeals has never required claims to be litigated together on that basis alone. Especially under these unique circumstances, this Court has broad discretion to sever the claims against DiPascali and may do so for a wide variety of reasons. See, e.g., Rice v. Sunrise Express, Inc., 209 F.3d 1008, 1016 (7th Cir. 2000) (upholding district court's severance of claims to permit trial by a magistrate judge); Lukowski v. County of Seneca, No. 08 Civ. 6098 (MAT), 2009 WL 467075, at *16 (W.D.N.Y. Feb. 24, 2009) (severing claims against defendants who had been indicted and/or convicted of crimes);

---

[5] At argument, Plaintiffs were unable to name a single witness in the United States apart from DiPascali. While the Complaint mentions David Friehling, a partner at Friehling & Horowitz, BMIS's auditor, he also pled guilty to various charges, and the Complaint does not allege that he was familiar with the Foreign Defendants' operations. (Compl. ¶¶ 49, 51.)

14

Cashman v. Montefiore Med. Ctr., 191 B.R. 558, 563 (S.D.N.Y. 1996) (severing to avoid delay due to automatic bankruptcy stay).

Ultimately, the dominant purpose served by DiPascali's inclusion in this litigation appears to be the creation of subject matter jurisdiction under CAFA.[6] Congress's goal in enacting CAFA, however, was "to check what it considered to be the overreadiness of some state courts to certify class actions. . . . In other words, Congress envisioned fewer—not more—class actions overall." Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co., 130 S. Ct. 1431, 1473 (2010) (Ginsburg, J., dissenting); see also McAtee v. Capital One, F.S.B., 479 F.3d 1143, 1147 (9th Cir. 2007) (noting that through CAFA, Congress sought to "expand[] the availability of the federal forum to accommodate concerns of class action defendants" in state courts). Thus, in some sense, Plaintiffs turn CAFA's limiting function on its head by using DiPascali to engineer jurisdiction for what is essentially a foreign dispute. Although this does not destroy subject matter jurisdiction, it does suggest the propriety of severing the claims against DiPascali

---

[6] This Court is not persuaded by Plaintiffs' argument that severance should be denied to permit the possibility of joint and several liability on a single claim of unjust enrichment. Not only are there countervailing considerations, but it is far from clear that joint and several liability is available on that claim. Joint and several liability is a tort principle, but a claim for unjust enrichment is a quasi-contract claim. See, e.g., Beth Israel Med. Ctr. v. Horizon Blue Cross and Blue Shield, 448 F.3d 573, 586-87 (2d Cir. 2006) ("The theory of unjust enrichment lies as a quasi-contract claim."); see also Myzel v. Fields, 386 F.2d 718, 744 (8th Cir. 1967) ("[A]n action . . . for unjust enrichment differs at common law from tortious conversion primarily on the basis that all the defendants may be held jointly liable in tort, while only those who have benefited are liable, and then only to the extent thereof, in an action for unjust enrichment."); Mike's Train House, Inc. v. Lionel L.L.C., No. 00 Civ. 71729 (JCO), 2004 WL 2472644, at *3 (E.D. Mich. Nov. 1, 2004), overruled on other grounds ("[O]nly a portion of the jury's award is subject to joint and several liability. Not subject to it are the unjust enrichment damages, which were based upon a calculation of each defendant's own profits from misappropriation."); Bankers Trust Co. v. Dukes, 97 Civ. 1417 (CCN), 1997 WL 727616, at *6 (E.D. Pa. Nov. 21, 1997) (finding that defendant is "not jointly and severally liable for the unjust enrichment of all the members of the conspiracy").

to facilitate a forum non conveniens dismissal.  See Blum v. Gen. Elec. Co., 547 F. Supp. 2d

717, 724 (W.D. Tex. 2008) ("The Court is aware of no authority contradicting Defendants'

unchallenged assertion that where a dismissal pursuant to the doctrine of forum non conveniens

is warranted for some plaintiffs, there exists sufficient cause to sever otherwise properly joined

parties."); see also Snee v. Sunrise Properties Ltd., 2009 WL 2163179, at *5 (S.D. Fla. July 17,

2009) ("[T]he Court finds that WIH is a nominal defendant, and one whose inclusion in this

lawsuit is insufficient to bar dismissal for forum non conveniens.").

        Importantly, the Court of Appeals has approved severance of claims against

collateral defendants to facilitate transfers of venue:

> We believe that where the administration of justice would be
> materially advanced by severance and transfer, a district court may
> properly sever the claims against one or more defendants for the
> purpose of permitting the transfer of the action against the other
> defendants, at least in cases where . . . the defendants as to whom
> venue would not be proper in the transferee district are alleged to
> be only indirectly connected to the manipulations which form the
> main subject matter of the action.

Wyndham Assocs. v. Bintliff, 398 F.2d 614, 618-19 (2d Cir. 1968); see also Basile v. Walt

Disney Co., 717 F. Supp. 2d 381, 389 (S.D.N.Y. 2010) (severing claims to facilitate transfer of

venue); Gold v. Burton Corp., 949 F. Supp. 208, 210 (S.D.N.Y. 1996) ("[T]he Court is

empowered to sever the action as against the two defendants and transfer the main proceeding to

the more convenient forum, provided its action in doing so would not effectively require that the

suit be litigated in two places.").  Similar considerations are present here.  Moreover, severance

is appropriate given that Plaintiffs named DiPascali despite their awareness of the unlikelihood

of recovery against him when they filed both the original and amended complaints.  Cf.

Universal Reinsurance Co., Ltd. v. St. Paul Fire and Marine Ins. Co., 312 F.3d 82, 90 (2d Cir.

2002) (upholding severance of counterclaims where Plaintiffs should have been aware of potential jurisdictional problems).

Severance will also avoid the substantial impracticalities associated with litigating in a forum where most of the documents and witnesses do not reside. In addition, Plaintiffs fail to articulate any meaningful delay resulting from severance. Although this action is nearly two years old, the parties spent that time mired in disputes over jurisdictional discovery and briefing the current motions. Thus, this litigation is in its infancy. If Plaintiffs file an action in Switzerland, they will be free to use the discovery they have obtained thus far. Severance may even lead to settlement because class actions are not available in Switzerland, thereby eliminating the incentive to generate fees for class counsel. Accordingly, the claims against DiPascali are severed.

II.  Forum Non Conveniens

While Defendants move to dismiss on forum non conveniens grounds, they also argue that this issue need not be reached because severance of the claims against DiPascali deprives this Court of subject matter jurisdiction. CAFA jurisdiction is a form of diversity jurisdiction under 28 U.S.C. § 1332, and the statute's requirement that at least one defendant be a citizen of a State appears designed to prevent federal court jurisdiction over suits involving only aliens. 28 U.S.C. § 1332(d)(2)(B). Accordingly, it would seem that diversity is destroyed where, as here, the claims against the sole domestic defendant in the action are severed. See Universal Licensing Corp. v. Paola del Lungo S.p.A., 293 F.3d 579, 581 (2d Cir. 2002) ('[D]iversity is lacking . . . where the only parties are foreign entities . . . .").

17

In this Court's view, however, a forum non conveniens analysis is warranted for several reasons, including (1) the claims against DiPascali are being severed largely to facilitate a forum non conveniens dismissal; (2) the destruction of subject matter jurisdiction under these circumstances appears to be an issue of first impression that was not briefed by the parties; and (3) CAFA jurisdiction is generally evaluated at the time the complaint is filed. See Blockbuster, Inc. v. Galeno, 472 F.3d 53, 56-57 (2d Cir. 2006) ("We generally evaluate jurisdictional facts . . . on the basis of the pleadings, viewed at the time" of filing); see also In re Burlington Northern Santa Fe Ry. Co., 606 F.3d 379, 381 (7th Cir. 2010) (per curiam) ("CAFA jurisdiction attaches when a case is filed as a class action . . . ."). Indeed, several circuits have held that "most post-removal events will not affect federal jurisdiction" under CAFA. 14B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 3724 (4th ed.); see, e.g., In re Burlington Northern, 606 F.3d at 381 (holding that "plaintiffs' decision not to pursue class certification" did not deprive the court of jurisdiction). Moreover, a court may dismiss on forum non conveniens grounds prior to resolving questions of jurisdiction. See In re Arbitration between Monegasque De Reassurances S.A.M. v. Nak Naftogaz of Ukr., 311 F.3d 488, 498 (2d Cir. 2002); Turedi v. Coca Cola Co., 460 F. Supp. 2d 507, 518 (S.D.N.Y. 2006).

"The doctrine of forum non conveniens is a discretionary device permitting a court in rare instances to dismiss a claim even if the court is a permissible venue with proper jurisdiction over the claim." Carey v. Bayerische Hypo-Und Vereinsbank AG, 370 F.3d 234, 237 (2d Cir. 2004). When evaluating a forum non conveniens challenge, a court should employ the "three-step analysis set forth in Iragorri v. United Techs. Corp., 274 F.3d 65, 71-75 (2d Cir. 2001) (en banc)." Abdullahi v. Pfizer, Inc., 562 F.3d 163, 189 (2d Cir. 2009). At the first step,

> a court determines the degree of deference properly accorded the plaintiff's choice of forum. At step two, it considers whether the alternative forum proposed by the defendants is adequate to adjudicate the parties' dispute. Finally, at step three, a court balances the private and public interests implicated in the choice of forum.

Norex Petroleum Ltd. v. Access Indus., Inc., 416 F.3d 146, 153 (2d Cir. 2005). A defendant bears the burden at steps two and three. Abdullahi, 562 F.3d at 189. In deciding a forum non conveniens challenge, a court may rely on evidence outside the pleadings, including affidavits. See Alcoa S. S. Co., Inc. v. M/V Nordic Regent, 654 F.2d 147, 158 (2d Cir. 1980) (en banc).

      a.   Deference to Plaintiffs' Choice of Forum

      At step one, a court should compare the lawsuit's bona fide connection to the forum against any indicia that the plaintiff was motivated by forum-shopping. Norex Petroleum, 416 F.3d at 154. A court should be mindful that while a foreign plaintiff's choice of forum is entitled to less deference, the more that choice is based on "legitimate reasons, the more deference [it] must be given . . . ." Bigio v. Coca-Cola Co., 448 F.3d 176, 179 (2d Cir. 2006). Factors disfavoring forum non conveniens dismissal "include the convenience of the plaintiff's residence in relation to the chosen forum, the availability of witnesses or evidence to the forum district, the defendant's amenability to suit in the forum district, the availability of appropriate legal assistance, and other reasons relating to convenience or expense." Iragorri, 274 F.3d at 72. In contrast, Plaintiffs' choice of forum deserves minimal deference where that choice was motivated by "attempts to win a tactical advantage resulting from local laws that favor the plaintiff's case, the habitual generosity of juries in the United States or in the forum district, the plaintiff's popularity or the defendant's unpopularity in the region, or the inconvenience and expense to the defendant resulting from litigation in that forum . . . ." Iragorri, 274 F.3d at 72.

On balance, Plaintiffs' choice of this District appears to have been based more on forum shopping considerations than on legitimate reasons. New York is among the potential fora for an action arising out of Madoff's fraud, and Plaintiffs faced the understandable dilemma of choosing a forum to litigate against defendants located in more than one country. However, this Court cannot ignore the fact that (1) Plaintiffs are foreign citizens and have no connection to the United States, see Cromer Fin. Ltd. v. Berger, 158 F. Supp. 2d 347, 355 (S.D.N.Y. 2001) ("This Court will apply a substantially reduced level of deference in any event due to the fact that the plaintiffs are assumed to be entirely foreign."); (2) Plaintiffs purport to represent a class of similar investors, see Gilstrap v. Radianz Ltd., 443 F. Supp. 2d 474, 479 (S.D.N.Y. 2006) ("Plaintiffs' choice of forum is also entitled to less deference where, as here, they are suing in a representative capacity."); (3) Plaintiffs do not bring a single claim under federal law, see DiRienzo v. Philip Services Corp., 294 F.3d 21, 28 (2d Cir. 2002) (holding that Plaintiffs had a "valid reason" for bringing suit in the United States where they sought enforcement of United States law in federal court); and (4) the "core operative facts" on which this litigation is based arise mostly out of the operations of foreign entities outside of the United States, see In re Alcon Shareholder Litig., 719 F. Supp. 2d 263, 269 (S.D.N.Y. 2010) ("[D]eference to a plaintiff's choice is diminished where the core operative facts upon which the litigation is brought bear little connection to the chosen forum.").

In addition, the filing of this putative class action in New York was undoubtedly fueled by the potential for attorneys' fees and the likelihood that a New York jury will be unsympathetic toward defendants in a Madoff-related action. See Iragorri, 274 F.3d at 72 (stating that a "defendant's unpopularity in the region" suggests forum shopping). "Taken

together, these considerations . . . are probative of forum shopping." In re Ski Train Fire in

Kaprun Austria on November 11, 2000, 499 F. Supp. 2d 437, 445 (S.D.N.Y. 2007) (finding

forum shopping where "plaintiffs [were] more likely to get higher damages awards and

contingency fees for attorneys in the United States; plaintiffs [were] not suing to enforce federal

laws; these [were] diversity actions arising in Austria and governed by Austrian law; all plaintiffs

hail[ed] from Europe and Asia, thus rendering the United States a comparatively inconvenient

forum; and in at least one instance, plaintiffs brought suit against the American affiliate of a real

party in interest merely in a transparent attempt to secure diversity jurisdiction in federal court.")

(quotations and citations omitted).  Accordingly, this Court finds that Plaintiffs' choice of forum

is entitled to very limited consideration.  See Niv v. Hilton Hotels Corp., 710 F. Supp. 2d 328,

335 (S.D.N.Y. 2008) ("Notwithstanding this Court's recognition that there could be legitimate

reasons for bringing the suit in this forum . . . , plaintiffs' choice of forum does not require the

'considerable' deference plaintiffs seek.").

       b.  Adequacy of Switzerland as a Forum

       "The adequate alternative venue requirement of the forum non conveniens

doctrine is ordinarily satisfied if (1) the defendants are amenable to service of process there, and

(2) the forum permits litigation of the subject matter of the dispute." Corporacion Tim, S.A. v.

Schumacher, 418 F. Supp. 2d 529, 532 (S.D.N.Y. 2006) (citing DiRienzo v. Philip Servs. Corp.,

232 F.3d 49, 57 (2d Cir. 2000)).  Here, both requirements are satisfied.

       First, the Foreign Defendants consent to jurisdiction in Switzerland.  (UBS

Luxembourg's Br. at 1 n.1; Hoegger Decl. ¶ 7.)  And since the claims against DiPascali are

severed, his consent is not required.  Second, Switzerland permits litigation of Plaintiffs' claims.

(See Declaration of Maurice Harari dated Jan. 28, 2011 at ¶¶ 52-74) (discussing Swiss law regarding claims of tort, contract, and breach of fiduciary duty); see also Do Rosario Veiga v. World Meteorological Organisation, 486 F. Supp. 2d 297, 304 (S.D.N.Y. 2007) ("[I]n the context of forum non conveniens inquiries, courts in this Circuit have repeatedly found that Switzerland is an adequate forum for adjudication of civil disputes involving common law claims based on contract and tort principles.").

        The only potential challenges to Switzerland's adequacy as a forum are Plaintiffs' arguments that their claims are (1) barred by Switzerland's one year statute of limitations, and (2) foreclosed by the dismissal of similar allegations in the Swiss Criminal Action. The first argument was rendered moot by the Foreign Defendants' agreement not to raise defenses based on timeliness in an action in Switzerland.[7] See In re Alcon Shareholder Litig., 719 F. Supp. 2d at 279 (conditioning dismissal on Defendants' "agreement [1] to accept service of process and to the exercise of personal jurisdiction by the relevant tribunal in Switzerland; . . . [2] not [to] assert any defenses based on statutes of limitations that would not be available to them were this litigation prosecuted in this Court; and [3] . . . [to] satisfy any final judgment rendered by a Swiss court in connection with such litigation."); see also Reply Declaration of Maurice Harari dated Apr. 8, 2011 ("Harari Reply Decl.") ¶ 30) (noting that the statute of limitations defense can be waived).) The second argument is without merit because the refusal of the District Attorney in the Swiss Criminal Action to pursue criminal allegations against Notz Stucki & Cie and Hoegger does not extinguish the possibility of recovery in a civil action involving additional entities. Defendants have demonstrated that the issues in that case—relating to piercing the corporate veil

---

[7] (See Tr. at 8-10.)

in the criminal context and individual liability—do not necessarily control in a civil case involving different statutes.  (Harari Reply Decl. ¶¶ 38-55.)  Accordingly, Switzerland is an adequate forum for an adjudication of Plaintiffs' claims.

        c.  Private and Public Interest Factors

      At step three, Defendants must establish that a balancing of the "private and public interest factors tilts heavily in favor of the alternative forum."  Abdullahi, 562 F.3d at 189.  "The private interest factors include: (1) the relative ease of access to evidence; (2) the cost to transport witnesses to trial; (3) the availability of compulsory process for unwilling witnesses; and (4) other factors that make the trial more expeditious or less expensive."  Maersk, Inc. v. Neewra, Inc., 554 F. Supp. 2d 424, 453-54 (S.D.N.Y. 2008).  "The public interest factors include: (1) settling local disputes in a local forum; (2) avoiding the difficulties of applying foreign law; and (3) avoiding the burden on jurors by having them decide cases that have no impact on their community."  Maersk, Inc., 554 F. Supp. 2d at 454.

      As to the private interest factors, it is clear that litigation in Switzerland will facilitate greater access to the evidence needed to establish Plaintiffs' claims.  First, most, if not all, of the potential witnesses reside there or in nearby Luxembourg; indeed, at argument, Plaintiffs were unable to provide the name of a single witness in the United States other than DiPascali and Madoff, whose participation is speculative.  (Tr. at 30.)  And the ease and expense of transporting witnesses from Luxembourg to Switzerland will be far less burdensome than to New York.  Plaintiffs' contention that "the unwilling witnesses and evidence located in New York [are] quantitatively and qualitatively more important than [those] in Switzerland" (Pls.' Br. at 37) is particularly unpersuasive: the Complaint's most prominently featured individual,

Echeverria, resides in Switzerland and, as a former Notz Stucki employee, is not subject to

compulsory process in New York.  See BlackRock, Inc. v. Schroders PLC, No. 07 Civ. 3183

(PKL), 2007 WL 1573933, at *9 (S.D.N.Y. May 30, 2007) (dismissing on forum non conveniens

grounds in part because "compulsory process is not available for Mr. Kussner, who is perhaps

the single most important witness in this matter").  In fact, given that Plaintiffs' claims against

the Notz Stucki Defendants depend largely on their disregard of the risks associated with

Madoff's trading strategy, Echeverria, who was aware of those risks, is arguably more important

than DiPascali himself.  Defendants have also made a sufficient showing that there are other

former Notz Stucki employees with potential discoverable information who are not subject to

compulsory process, notwithstanding Plaintiffs' attempt to minimize those witnesses'

importance.  See Cortec Corp. v. Erste Bank Ber Oesterreichischen Sparkassen AG (Erste Bank),

535 F. Supp. 2d 403, 412 (S.D.N.Y. 2008) ("Many of the potential witnesses in the case . . . are

not subject to process from this [c]ourt.").

          As to access to documentary evidence, Plaintiffs rely erroneously on the argument

that New York is the proper forum because the documents produced to date are in English.  Less

than 60,000 documents have been produced thus far, which in a case spanning twelve years and

involving several large corporations is likely to represent a tiny fraction of the pertinent

documents in this litigation.  Moreover, Plaintiffs fail to support their contention that the

"majority of [all relevant] documents are in English."  (Pls. Opp'n at 40.)  In view of the fact that

Notz Bermuda delegated nearly all of its responsibilities to Notz Stucki & Cie, the majority of

discovery will be taken from that firm in Switzerland.  And Plaintiffs do not rebut Defendants'

assertion that many of Notz Stucki & Cie's documents are in French.  As Plaintiff's own

declaration illustrates,[8] the expense associated with providing certified translations for use in a

United States litigation will be enormous. See Cortec, 535 F. Supp. 2d at 412 (stating that the

court's analysis "must include the private cost of providing certified translations of hundreds of

pages of documentary evidence").

Moreover, there is no dispute that the vast majority of the Foreign Defendants'

documents are located in Switzerland and Luxembourg. See Online Payment Solutions Inc. v.

Svenska Handelsbanken AB, 638 F. Supp. 2d 375, 388 (S.D.N.Y. 2009) (stating that while "the

costs of transporting documents are not as prohibitive as they once were," where "the majority of

relevant evidence is located abroad, the burden imposed on the parties is still significant and

favors dismissal"). While Plaintiffs attempt to avoid this fact by emphasizing the importance of

BMIS documents in New York, they ignore certain additional costs of discovery, namely,

compliance with foreign privacy laws. The progress of this action was impeded for nearly a year

by the parties' dispute over the Foreign Defendants' obligations under those laws, and there is

little reason to believe that those tensions will dissipate during full-blown discovery. See

Crosstown Songs U.K. Ltd. v. Spirit Music Grp., Inc., 513 F. Supp. 2d 13, 17 (S.D.N.Y. 2007)

("If this suit is not dismissed, [Defendant] will have to engage in the time-consuming and

expensive process of obtaining essential documentary evidence and witness testimony under the

Hague Convention."). In addition, Plaintiffs fail to articulate why a lawsuit in Switzerland

would prevent them from gaining to access to relevant BMIS documents.

Plaintiffs also exaggerate the potential efficiencies achieved through joint

---

[8] (Ellman Decl. ¶ 6 (recording the cost of translating a single 16-page document at approximately $1400).)

coordination with the Trustee Actions. First, the survival of these actions is uncertain; a court in this District recently dismissed a similar action by the Trustee for lack of standing, and an identical motion is pending in the case against UBS Luxembourg.[9] See Picard v. HSBC Bank PLC, --- B.R. ----, 2011 WL 3200298, at *11 (S.D.N.Y. July 28, 2011); (Mot. To Dismiss, Picard v. UBS Fund Servs. (Luxembourg) SA, 11 Civ. 4212, ECF No. 17.) Thus, those actions may never reach the discovery stage. More importantly, the Court of Appeals has observed that "[t]he existence of related litigation, while of major significance in § 1404(a) cases, is not listed as a relevant factor in the forum non conveniens analysis laid out in Gilbert." Guidi v. Inter-Continental Hotels Corp., 224 F.3d 142, 148 (2d Cir. 2000); accord DiRienzo v. Philip Services Corp., 294 F.3d 21, 31 (2d Cir. 2002). Although courts relying on this rule have generally disregarded related actions in the foreign forum, the Court of Appeals' language is broad and "suggest[s] that [related litigation] may only be relevant where 'parties to the American and foreign actions are identical and there is the likelihood of significant duplication of legal efforts on behalf of all the parties.'" Cromer Fin. Ltd. v. Berger, 158 F. Supp. 2d 347, 363 (S.D.N.Y. 2001) (quoting Guidi, 224 F.3d at 148). Because the parties in this action and the Trustee Actions are not identical, this Court finds that the Trustee Actions are immaterial to the forum non conveniens analysis.

As to the public interest factors, this Court notes first that New York has a relatively minimal interest in this litigation. While this action is peripherally related to New York through Madoff, his involvement alone does not give New York a substantial interest in this litigation. Neither Madoff nor his sons are defendants in this action, the claims against

---

[9] Judge Rakoff, who dismissed the Trustee's action, recently accepted the Trustee's action against Plaza and Notz Stucki Bermuda as a related action.

DiPascali are severed, and DiPascali has already pled guilty to criminal charges.  Moreover, the central parties in this litigation are foreign, and this Court is not being called on to interpret federal law.  See DiRienzo, 294 F.3d at 33 (private factors weighed against forum non conveniens dismissal in part because "of the interest of the United States in enforcing its securities laws").

Contrary to Plaintiffs' contention, Switzerland does have an interest in the claims against UBS Luxembourg.  To the extent New York's interest is premised on UBS Luxembourg's relationship and cooperation with a New York entity (i.e., BMIS), Switzerland can be said to have a similar interest: UBS Luxembourg is alleged to have substantially assisted Notz Stucki & Cie's fraud.  As the Complaint recounts,

> [UBS Luxembourg] provided substantial assistance to the Notz Stucki Defendants in the fraud and breaches of fiduciary duty that they perpetrated on investors.
>
> . . .
>
> Specifically, [UBS Luxembourg] assisted the Notz Stucki Defendants by receiving investments from Plaintiffs and the Class and transferring their funds to BMIS; consenting to the use of [UBS Luxembourg's] name and the services it was ostensibly providing to be included in [Plaza's] Information Memoranda and other documents; and recording the securities Madoff said he was holding.  The Notz Stucki Defendants could not have perpetrated their fraud and breaches of fiduciary duty without this substantial assistance by [UBS Luxembourg].

(Compl. ¶¶ 75-76.) Switzerland's interest in a Luxembourg entity that was used as an instrumentality for fraud by a Swiss corporation cannot be denied.  For all of these reasons, this Court finds that Switzerland has a substantially greater interest in this action than New York.

The application of foreign law factor is neutral.  Plaintiffs bring common law

claims, which raise issues under the laws of various jurisdictions, including New York,

Switzerland, and Luxembourg.  The choice of law analysis is somewhat complicated, and none

of the parties have presented a persuasive argument demonstrating that the law of any single

jurisdiction will govern.  See Pollux Holding Ltd. v. Chase Manhattan Bank, 329 F.3d 64, 76 (2d

Cir. 2003) (upholding district court's determination that "the overwhelming majority of

plaintiffs' claims necessitate the application of English law").  Accordingly, the application of

forum law factor "does not favor either forum."  DiRienzo, 294 F.3d at 31.

On the question of court congestion, this District is "one of the busiest in the

country, making it a paradigmatic 'congested center' of litigation alluded to in Gilbert."  Tel.

Sys. Int'l, Inc. v. Network Telecom PLC, 303 F. Supp. 2d 377, 384 (S.D.N.Y. 2003).  And while

the Court of Appeals has found that a district operating without judicial vacancies eliminates

concerns of congestion, Guidi, 224 F.3d at 147, that explanation is not persuasive at the present

time—there are currently seven judicial vacancies in this District.  Conversely, Plaintiffs fail to

dispute Defendants' assertion that the Swiss courts are not heavily congested.  (See Pls. Opp'n at

43-44.)

Finally, Plaintiffs' argument that filing fees and bonds imposed by Swiss courts

favor litigation in New York is misplaced.  Plaintiffs not only exaggerate those fees, (see Harari

Reply Decl. at ¶¶ 12-27), but also fail to demonstrate their inability to afford them.  See Wilson

v. ImageSat Int'l N.V., No. Civ. 6176 (DLC), 2008 WL 2851511, at *7 (S.D.N.Y. Jul. 22, 2008)

("[P]laintiffs have not shown, much less argued, that they will be unable to afford the cost of

pursuing their claims in Israel.").  Moreover, Swiss courts have the authority to authorize fee

exemptions for plaintiffs lacking the financial means to pursue their claims.  (See Harari Reply

Decl. at ¶¶ 5-7.)  And to the extent Defendants are correct that the bond requirement can be waived, (see Harari Reply Decl. ¶ 22), this Court will require them to agree to such waiver as a condition of this dismissal.

Overall, a balancing of the private and public factors demonstrates that litigation in New York is "genuinely inconvenient" and that Switzerland is a "significantly preferable" forum. Iragorri, 274 F.3d at 75.  Accordingly, Defendants' motion to dismiss the claims against the Foreign Defendants on forum non conveniens grounds is granted.

CONCLUSION

For the foregoing reasons, the motion to sever the claims against Frank DiPascali and to dismiss the claims against Defendants Notz Stucki Bermuda, Notz, Stucki & Cie, and UBS Luxembourg on forum non conveniens grounds is granted. Defendants' remaining motions are moot. The Clerk of the Court is directed to terminate all pending motions in this case. Plaintiffs and Frank DiPascali are directed to appear for a conference on September 9, 2011 at 11:30 a.m.

Dated: August 25, 2011
      New York, New York

SO ORDERED:

_____
WILLIAM H. PAULEY III
U.S.D.J.

30

Counsel of Record:

Javier Bleichmar, Esq.
Labaton Sucharow LLP
140 Broadway
New York, NY 10005
*Counsel for Plaintiffs*

Joseph P. Moodhe, Esq.
Shannon R. Selden, Esq.
Debevoise & Plimpton, LLP
919 Third Avenue,31st Floor
New York, NY 10022
*Counsel for the Notz Stucki Defendants*

Marshall R. King, Esq.
Gibson, Dunn & Crutcher, LLP
200 Park Avenue, 48th Floor
New York, NY 10166
*Counsel for UBS (Luxembourg) S.A.*

David J. Ball, Esq.
Bracewell & Giuliani, LLP
1251 Avenue of the Americas, 49th Floor
New York, NY 10020
*Counsel for Frank DiPascali*